No. 14348

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

GEORGE and MARIE KADILLAK,
husband and wife et al.,

Plaintiffs and Appellants,

-vs-

THE ANACONDA COMPANY et al.,

Defendants and Respondents.

---

Appeal from: District Court of the Second Judicial District,
Honorable Frank E. Blair, Judge presiding.

Counsel of Record:

For Appellants:

McGarvey, Lence and Heberling, Kalispell, Montana
Dale L. McGarvey argued and Jon L. Heberling argued,
Kalispell, Montana

For Respondents:

Hon. Mike Greely, Attorney General, Helena, Montana
D. L. Holland argued, (Anaconda Co.) Butte, Montana
John North argued, (State Lands) Helena, Montana
Jack Holstrom argued, (State Highways) Helena, Montana
Stan Bradshaw argued (Dept. of Health) Helena, Montana

---

Submitted: June 15, 1979
Decided: OCT 16 1979

Filed: OCT 16 1979

*Thomas J. Kearney*
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Plaintiffs appeal from a judgment of the District Court of Silver Bow County denying them relief on their complaint against the Anaconda Company and various state agencies relating to the establishment and operation of a waste dump containing overburden and discard from open pit mining operations in the vicinity of their residences.

Early in the spring of 1974, residents of the Hillcrest subdivision in Butte, Montana, learned from newspaper articles that the Anaconda Company was contemplating mining activities in close proximity to their homes. They were naturally concerned about this prospect and contacted Anaconda officials and various state agencies to voice that concern.

On June 6, 1974, Anaconda filed with the Department of State Lands (State Lands) an application for a permit for mining activities in the contested area. The application was in the form of a request for an amendment to a previously held permit, Mining Permit No. 41. State Lands was unsure whether such a procedure was proper, so it requested an Attorney General's Opinion. After an extended delay, the Attorney General rendered an opinion on August 29, 1975, that acreage could not be added to a mining permit by amendment; rather, a new operating permit must be applied for to cover the new area.

On September 25, 1975, Anaconda officials met with State Lands and it was agreed that the pending application for amendment of Permit No. 41 would be considered the basis for an application for a new permit called Permit 41A. Anaconda was to submit a revised map showing the acreage to be included. That map was received on October 22, 1975, at which time Wilbur Criswill, State Lands Hard Rock Bureau Chief, deemed the application complete. Ted Schwinden, at that time Commissioner of State Lands

determined that issuance of Permit 41A would be a major action of state government with possible adverse environmental effects requiring an impact statement under the Montana Environmental Policy Act (MEPA). Schwinden assigned the task of writing the 41A environmental impact statement (EIS) to Charles Van Hook, a member of the staff of State Lands Reclamation Division. The 41A EIS was the first EIS Van Hook had ever written.

Van Hook began work on the 41A EIS on November 25, 1975. On December 4, he requested in a letter to Anaconda certain additional information on mining and reclamation plans "needed . . . to construct an accurate impact statement." Anaconda supplied more data in response on December 9, but Van Hook still felt the materials were deficient.

Subsequently, on or about December 15, 1975, Van Hook submitted a memo to his superior at State Lands, C. C. McCall, noting that his study of the application materials and the regulations in regard to issuance of Hard Rock Permit 41A indicated the application did not meet the requirements of the law in numerous respects. McCall then drafted a memo to Commissioner Schwinden detailing numerous specific areas where the application for Permit 41A failed to meet the statutory requirements of the Hard Rock Mining Act (HRMA).

On December 15, 1975, the same date as the memo from McCall, Schwinden summoned Anaconda representatives to a meeting to discuss the problems concerning the Permit 41A application. Van Hook and McCall explained the areas of concern. That evening, Anaconda officials spent several hours working up more data in response to those problems, and on December 16 they submitted a mining plan and some further information. This new data was incorporated in the EIS which was mailed out on Friday, December 19. None of the State Lands officials had time to check the new material against

the regulations and statutes for completeness before the EIS went out. On December 22, 1975, Commissioner Schwinden approved Permit 41A.

On January 5, 1976, an article appeared in the Billings Gazette concerning plans of the Anaconda Company to construct in the 41A Permit area a mountainous waste dump of overburden and discard from open pit mining operations. The dump area approaches within a quarter of a mile of homes in the Hillcrest subdivision. The permit area comes to within 200 feet. On January 15 and 16, 1976, a representative of the Hillcrest residents contacted the State Environmental Quality Control Council (EQC) about possible irregularities in the issuance of Permit 41A. By letter dated January 16, 1976, Steven J. Perlmutter, staff attorney for EQC, replied to those inquiries, expressing the opinion that the procedure followed in issuing Permit 41A may indeed have violated sections of the HRMA, MEPA, and the Montana Administrative Procedures Act (MAPA).

The original complaint in this action was filed on March 12, 1976. The complaint was amended on May 26, 1976. The plaintiffs are approximately 125 property owners in the Hillcrest and Continental Drive areas of Butte in close proximity to the waste dump. The complaint is captioned "Complaint for Injunction" and is framed in 14 separate causes of action. The relief sought is revocation of Permit 41A and injunction against Anaconda prohibiting mining activities in the 41A area until writs of mandate directed to State Lands to reconsider the permit in the light of MEPA requirements and the HRMA, to DHES to require pollution permits, and to the Department of Highways to prepare an EIS on the abandonment of U.S. 91, have been performed to the court's satisfaction. No preliminary injunction was sought; work on Anaconda's Hillcrest dump commenced in August or September, 1976, and continues, presumably, to the present. The dump is now a mountain

of substantial dimensions.

Trial of this cause commenced in Silver Bow County District Court on August 22, 1977. It encompassed 13 days of testimony and argument. After submission of briefs and consideration of the case, the court filed findings of fact, conclusions of law and a supporting memorandum on March 13, 1978. The findings and conclusions address separately each of the causes of action contained in the complaint. Judgment was subsequently entered for defendants and against plaintiffs on all causes of action, denying any relief.

The issues on appeal are:

1. Was an EIS required before Permit 41A issued and if so, was the EIS which was prepared adequate under MEPA?

2. Was the application for Permit 41A deficient under the Hard Rock Mining Act, and if so, was the granting of the permit by State Lands in violation of a clear legal duty?

3. Were public notice and opportunity for hearing required before Permit 41A was issued by State Lands?

4. Was Permit 41A invalid because a permit under the Clean Air Act was not obtained?

5. Whether the Department of Highways was required to prepare an EIS on the abandonment of U.S. 91 in conjunction with Permit 41A, and whether the failure to do so renders the permit invalid?

6. Is a writ of mandate a proper remedy?

7. Are plaintiffs entitled to attorney fees for enforcement of their constitutional right to know under section 2-3-221, MCA?

ENVIRONMENTAL IMPACT STATEMENT

The first issue is whether an EIS is required before granting a permit under the Hard Rock Mining Act (HRMA). We hold that

- 5 -

under the facts of this case an EIS was not required.

The Montana Environmental Policy Act (MEPA) provides, in part:

> "The legislature authorizes and directs that, to the fullest extent possible:
>
> "(1) the policies, regulations, and laws of the state shall be interpreted and administered in accordance with the policies set forth in this chapter;
>
> "(2) all agencies of the state shall:
>
> " . . .
>
> "(c) include in every recommendation or report on proposals for projects, programs, legislation, and other major actions of state government signifi- cantly affecting the quality of the human environ- ment, a detailed statement . . ." Section 75-1-201, MCA. (Emphasis added.)

The action which allegedly affects this environment is the dumping of overburden and other waste by the defendant Anaconda Company. This can occur only in conformity with a permit granted by the Board of Land Commissioners. Section 82-4-335, MCA. It is well accepted that granting a permit or license to act is a state action which must be accompanied by an EIS if the activity it allows is capable of significantly affecting the human environment. Rodgers, Environmental Law, §7.6, pp. 761-63.

We fully recognize that not every action of state government requires the preparation of an EIS. If the agency properly decides that the action will not "significantly affect the human environment" an EIS is not necessary.

In the instant case a mammoth project was proposed and the Commissioner of State Lands was quite correct in deciding that an EIS must precede the granting of a permit.

At the time application for Permit 41A was filed, the Hard Rock Mining Act required:

> "Upon receipt of an application for an operating permit the mining site shall be inspected by the department. Within sixty (60) days of receipt

of the complete application and reclamation plan
by the board and receipt of the permit fee, <u>the
board shall either issue an operating permit to
the applicant or return any incomplete or inade-
quate application to the applicant</u> along with a
description of the deficiencies. <u>Failure of the
board to so act within that period shall consti-
tute approval of the application</u> and the permit
shall be issued promptly thereafter." Section
82-4-337, MCA. (Emphasis added.)

The 60 day period is a woefully inadequate period for the prep-

aration of a proper EIS. As noted by the United States Supreme

Court, a draft EIS on simple projects prepared by experienced

personnel takes some three to five months to complete. Flint

Ridge Development Co. v. Scenic Rivers Assoc. (1976), 426 U.S.

776, 789, 96 S.Ct. 2430, 2438, 49 L Ed 2d 205, 216, n. 10. This

fact was recognized by the legislature when in 1977 the statute

was amended to provide:

"If the department determines that additional
time is needed to review the application and
reclamation plan for a major operation, the
department and the applicant shall negotiate to
extend the 60-day period by not more than 365 days
in order to permit reasonable review." Section
82-4-337(1)(b)(ii), MCA; Sec. 1, Ch. 427, Laws
of Montana (1977).

Testimony was presented and the District Court ruled that because

the 60 day period could not possibly accommodate the preparation

of an EIS, an EIS was not required. This conclusion was reached

on the basis of Flint Ridge Development Co. v. Scenic Rivers Assoc.,

supra; and Moloney v. Kreps (D.N.J. 1977), 10 ERC 1773.

In <u>Flint Ridge</u>, the Court considered whether an EIS is re-

quired when the Secretary of Housing and Urban Development reviews

a disclosure statement under the Disclosure Act, which requires

land developers to file these statements for the information of

potential buyers. The developer may not sell or lease any lot

until the disclosure statement is approved by the Secretary. Once

the disclosure statement is filed with him, the Secretary has 30

days to approve or disapprove it. If the Secretary fails to act

within the 30 day period, the disclosure statement is deemed

automatically approved.

The Scenic River Association contended that the National Environment Policy Act had the effect of authorizing the Secretary to suspend the 30-day time limit while an EIS is prepared. In rejecting this argument, the United States Supreme Court stated:

> "The Secretary cannot comply with the statutory duty to allow statements of record to go into effect within 30 days of filing, absent inaccurate or incomplete disclosure, and simultaneously prepare impact statements on proposed developments. In these circumstances, we find that NEPA's impact statement requirement is inapplicable." Flint Ridge, 426 U.S. at 791, 96 S.Ct. at 2440, 49 L Ed 2d at 218.

The high court noted the legislative intent behind the Act:

> "The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in [§102(2)] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible. . ." Flint Ridge, 426 U.S. at 787-788, 96 S.Ct. at 2438, 49 L Ed 2d at 216, citing 115 Cong. Rec. 29703 (1969). (Note: section 102(2), NEPA corresponds with section 75-1-201(1)(c), MCA, which imposes the duty of preparing an EIS on state agencies.)

The Court reasoned that: "Section 102 recognizes . . . that where a clear and unavoidable conflict in statutory authority exists, NEPA must give way." 426 U.S. at 788, 96 S.Ct. at 2438, 49 L Ed 2d 216. This statement has been cited in numerous cases for the proposition that when a statutory time limit precludes the statutory duty of preparing an EIS, the EIS must yield. The federal courts have concluded that in such situations an EIS is not necessary. See e.g. Moloney, 10 ERC 1773; Concerned about Trident v. Rumsfeld (D.C.Cir.Ct. 1977), 555 F.2d 817, 823.

Under the facts of the instant case this Court holds that an EIS was not required for the same reasons that an EIS was not required in the Flint Ridge case. The language, "to the fullest extent possible" is identical in both the NEPA and MEPA. The trial court found that an adequate EIS would require 5 to 6 months to complete and that an EIS for the Permit 41A project

could not have been prepared in 60 days.

Additionally, it is a well settled principle of statutory construction that the specific statute will control the general. State ex rel. Marlenee v. District Court (1979), ____ Mont.____, 592 P.2d 153, at 156, 36 St.Rep. 457, at 461. At the time of the filing of Permit 41A State Lands had a specific 60 day period within which to act. In comparison, the MEPA is prefaced with the language, "to the fullest extent possible." The MEPA is the general statute in these circumstances. HRMA is the specific statute and controls in this case.

We emphasize that Flint Ridge and similar federal cases are uniformly based on the unavoidable and irreconcilable conflict between federal statutes. It was stated in the dissent to Montana Wilderness Ass'n v. Bd. of Health and Environmental Sciences (1976), 171 Mont. 477, 506, 559 P.2d 1157, 1172, (Haswell J., dissenting):

> "Because MEPA is modeled after NEPA, it is appropriate to look to the federal interpretation of NEPA. This Court follows the rule found in Ancient Order of Hibernians v. Sparrow [1903], 29 Mont. 132, 135, 74 P. 197, 198:
>
> "'" . . . that the construction put upon statutes by the courts of the state from which they are borrowed is entitled to respectful consideration, and . . . only strong reasons will warrant a departure from it."'"

The appellants contend that a "strong reason" to depart from the federal interpretation are the following sections in the 1972 Montana Constitution:

> "All people are born free and have certain inalienable rights. They include the right to a clean and healthful environment. . ." 1972 Mont. Const., Art. II, §3.
>
> " . . .
>
> "(1)  The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations.
>
> "(2)  The legislature shall provide for the administration and enforcement of this duty.
>
> "(3)  The legislature shall provide adequate remedies

for the protection of the environmental life
support system from degradation and provide
adequate remedies to prevent unreasonable de-
pletion and degradation of natural resources."
1972 Mont. Const., Art. IX, §1.

This argument, however, does not have sufficient merit
to compel this Court to abandon the rationale of <u>Flint Ridge</u>.
Both the MEPA and the HRMA predate the new constitution.  There
is no indication that the MEPA was enacted to implement the new
constitutional guarantee of a "clean and healthful environment."
This Court finds that the statutory requirement of an EIS is not
given constitutional status by the subsequent enactment of this
constitutional guarantee.  If the legislature had intended to give
an EIS constitutional status they could have done so after 1972.
It is not the function of this Court to insert into a statute
"what has been omitted."  Security Bank v. Connors (1976), 170
Mont. 59, 67, 550 P.2d 1313, 1317.  The ordinary rules of stat-
utory construction apply.  An EIS was not a requirement at the
time Permit 41A was granted.

HARDROCK MINING ACT

The HRMA, section 82-4-301 et seq., MCA, provides in part
that "no person shall engage in mining in the state without first
obtaining an operating permit from the board to do so."  Section
82-4-335, MCA.  State Lands is given the responsibility of admin-
istering the HRMA. Section 82-4-321, MCA.  The application for a
permit under this Act must contain several specific items of in-
formation including a proposed reclamation plan, and a plan of
mining.  Section 82-4-335, MCA.

Among other claims of error in issuing the permit, plain-
tiffs argue that there was no mining plan for 410 acres of the
500 acres included in Permit 41A.  A review of the two-page mining
plan indicates that this is true.  The application requested a
permit covering 500 acres, yet the mining plan only refers to 90
acres.  Nothing is said about the plans for the other 410 acres.

- 10 -

Defendant State Lands argues that this deficiency can be cured later by requiring Anaconda to submit a mining plan for the additional acres. It must be noted that the mining plan must be submitted _before_ the permit is issued. To allow the issuance of a permit for the entire 500 acres when there is a mining plan for only 90 acres violates the express requirements of HRMA.

Although the deficiency of the mining plan is sufficient grounds for voiding the permit, three other independent grounds exist for invalidating it:

1. A reclamation plan must be included in every application for a permit under the HRMA. Section 82-4-335(3), MCA. Rule 5A3, A.R.M. 26-2.10(2) - S10030, requires that pertinent climatic conditions be described in the reclamation plan. In the Permit 41A application Anaconda devotes one sentence to climatic conditions. This one sentence merely gives the annual rainfall in the Butte area. There is no mention of temperature, wind patterns or any other pertinent climatological data which would give the agency an opportunity to correctly evaluate the proposed uses of the reclaimed land. This one sentence description is inadequate as a matter of law. For State Lands to approve this description in light of the purposes for which this data must be used is an abuse of discretion.

2. Section 82-4-303(10)(a) requires that the reclamation plan include a "proposed subsequent use of the land after reclamation." This is omitted from the Permit 41A reclamation plan. There is a statement on page 1 of the plan that "upon termination of mining and associated disturbances the Company will consider offering the land for other uses."

This Court notes that a statement as to the subsequent use of the disturbed land is central to any meaningful decision concerning the adequacy of the reclamation plan. State Lands could not possibly make an informed or adequate evaluation of the

reclamation plan unless they were given a sufficient statement as to what the reclamation plan is supposed to accomplish. To allow the statement, "The Company will consider offering the land for other uses" as an adequate statement of subsequent use would be to make a mockery of the HRMA. Such statement is inadequate as a matter of law.

3. Section 82-4-335(5), MCA, requires that a map be submitted showing the area which will be disturbed by the proposed mining activity. In this case a map covering only 90 acres was submitted and a permit for 500 acres was granted. This is a clear violation of the HRMA.

For these reasons the permit was invalid. The present mining operations on the 500 acres covered by Permit 41A cannot be continued until an adequate application is made and a valid permit pursuant to the HRMA is issued.

NOTICE AND HEARING

Plaintiff homeowners basically contend that Permit 41A was invalid because State Lands did not give notice and offer an opportunity for a hearing before the permit was issued. They claim that they were denied their right to notice and participation which is granted by section 2-3-103(1), MCA. At the time this action commenced the predecessor to this section (section 82-4228, R.C.M. 1947) did grant the public the right to have notice and to participate in agency actions such as granting a permit. It must be noted, though, that section 2-3-114 requires that action must be taken in District Court within 30 days of the date of decision. In the instant case, the permit was granted on December 22, 1975, and the original complaint was filed on March 12, 1976. Thus, the District Court lacked jurisdiction to consider plaintiffs' rights under this section.

Plaintiffs next contend that they were entitled to a hearing under the MAPA. The applicable section reads:

- 12 -

> "in a contested case, all parties shall be afforded
> an opportunity for hearing after reasonable notice."
> Section 2-4-601, MCA.

"Contested case" is defined in the MAPA as follows:

> "'Contested case' means any proceeding before an
> agency in which a determination of legal rights,
> duties, or privileges of a party is required by
> law to be made after an opportunity for hearing.
> The term includes but is not restricted to rate
> making, price fixing, and licensing." Section
> 2-4-102(4), MCA.

Under the HRMA, as it existed at the time that these events transpired, no opportunity for a hearing was required before the permit was issued. Consequently, this was not a contested case under the HRMA, or under the MAPA. In fact if this had been a "contested case" under the MAPA the District Court would have been without jurisdiction to consider this case in the first instance. Section 2-4-702(2)(a), MCA, provides that "Proceedings for review [of contested cases] shall be instituted by filing a petition in district court within 30 days after service of the final decision . . . ."

Plaintiffs also contend that Article II, Section 8, 1972 Mont. Const., provides authority for the proposition that they were entitled to an opportunity to participate in the decision to grant Permit 41A. This section says:

> "Right of Participation. The public has the
> right to expect governmental agencies to afford
> such reasonable opportunity for citizen participation
> in the operation of the agencies prior to the final
> decision as may be provided by law." (Emphasis
> added.)

Under this section the public's right to participate is limited to those instances where that right is "provided by law." The HRMA, as noted above, does not provide for public participation in the decision making activity which proceeds the issuing of a permit. In the instant case, this constitutional provision does not support plaintiffs' contention.

CLEAN AIR ACT

The next issue raised by the plaintiffs is the failure of

the Department of Health and Environmental Sciences (DHES) to control air pollution from the 41A dump area. Plaintiffs contend that DHES has violated a clear legal duty controllable by a writ of mandate.

Mandamus lies only to compel performance of a ministerial duty and never to compel the performance of a duty or power that requires the exercise of discretion. State ex rel. Wiedman v. City of Kalispell (1969), 154 Mont. 31, 34, 459 P.2d 694, 696. The relevant statute is section 75-2-204, MCA, which provides:

> "The board may by rule prohibit the construction, installation, alteration, or use of a machine, equipment, device or facility which it finds may directly or indirectly cause or contribute to air pollution or which is intended primarily to prevent or control the emission of air pollutants, unless a permit therefore has been obtained."

The language of this statute is couched in terms which clearly indicate a discretionary function. The statute begins, "The board may . . ." This clearly indicates that the legislature was giving the DHES a discretionary duty in this respect. Since the duty was discretionary rather than ministerial, a writ of mandate cannot be issued against DHES.

THE DEPARTMENT OF HIGHWAYS

Plaintiffs contend that an EIS is required on the abandonment of U. S. Highway 91. This issue arose because the Permit 41A area is bisected by old U.S. 91. The highway itself is not included in the requested permit area, but is bordered by the permit area on each side. At the time Permit 41A was applied for, Anaconda had in process a petition to abandon U. S. 91. The evidence presented at the trial of this matter indicates that the State Highway Commission had not yet made a decision whether to abandon the highway. No evidence of the abandonment was before the trial court.

On February 1, 1978, the Highway Commission entered an

order of abandonment on the 3.2 miles of U. S. 91 that passes through the Permit 41A area, upon payment by Anaconda of $1.8 million. This occurred after judgment on this matter had been entered by the District Court.

At the time this case went to trial, no final decision had been made by the Highway Commission concerning the abandonment of U. S. 91. Courts will not ordinarily administer judicial remedies while the matter is pending in administrative proceedings. This deference on the part of courts "is generally applied when the Court believes that consideration of policy recommends that the issue be left to the administrative agency for initial determination." Grever v. Idaho Telephone Co. (1972), 94 Idaho 900, 499 P.2d 1256, 1258.

Here the District Court was correct in ruling this issue to have been prematurely submitted for review. It is a sound policy that courts will not interfere with an agency proceeding until there is final action by that agency on a particular matter.

MANDAMUS

Since this opinion affirms the judgment as to DHES and the Highway Department, mandamus will be discussed only as it applies to State Lands.

The statutory law concerning the writ of mandate in Montana is contained at sections 27-26-101 et seq., MCA. Section 27-26-102(1) provides in pertinent part that this writ " . . . may be issued by the supreme court . . . to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station . . . ."

As stated by this Court in State ex rel. Swart v. Casne (1977), 172 Mont. 302, 309, 564 P.2d 983, 987:

> "The writ will issue only where the person seeking to invoke it is entitled to have the defendant perform a clear legal duty and there is no speedy or adequate remedy in the ordinary course of law."

In the instant case we hold that State Lands had a clear legal duty to require that Anaconda submit the required application before Permit 41A was issued. Section 82-4-337(1)(a), MCA, states the duty which is imposed upon State Lands when faced with a deficient application. This statute states in part:

> " . . . the board shall either issue an oper-
> ating permit to the applicant or return any
> incomplete or inadequate application, along
> with a description of the deficiencies . . ."
> (Emphasis added.)

State Lands' duty when faced with a deficient application (such as Anaconda's in this case) becomes readily apparent from a reading of the statute. State Lands "shall . . . return any incomplete or inadequate application." (Emphasis added.) If the application is complete and adequate then State Lands "shall . . . issue an operating permit." Anaconda's application was obviously incomplete and inadequate. For State Lands to issue a permit for 500 acres when the mining plan only covers 90 acres constitutes a clear abuse of discretion and is a failure to perform a clear legal duty. State Lands had a clear legal duty to return the application as incomplete and inadequate.

State Lands contends that mandamus cannot lie to correct or undo an act already performed. Melton v. Oleson (1974), 165 Mont. 424, 432, 530 P.2d 466, 470. This is a correct statement of the law. What this Court is mandating, however, is not the undoing of an act. Rather, we are directing State Lands to perform an act which they have not done and which they had a clear legal duty to do. They are to return the Permit 41A application to Anaconda as inadequate and incomplete. Because the application was not returned Permit 41A was void from the beginning and Anaconda may not continue the mining activities on the Permit 41A area until a valid permit is granted by State Lands.

ATTORNEY FEES UNDER SECTION 2-3-221, MCA.

This issue need not be discussed, because attorney fees

are available to plaintiffs under the mandamus statutes, section 27-26-402, MCA.

In summary, we mandate that State Lands is to return the application for Permit 41A as incomplete and inadequate. We enjoin further use of the 41A area for mining operations until a valid permit is issued by State Lands. The cause is remanded to the District Court for an evidentiary hearing on attorney fees which are granted to the prevailing party on a writ of mandate. All other relief is denied.

_____
                                            Chief Justice

We concur:

_____

_____
Justices

_____
Hon. Joel G. Roth, District Judge,
sitting in place of Mr. Justice
John C. Sheehy.


Mr. Justice Daniel J. Shea specially concurs and will file
an opinion later.