No. 94-564

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

RAVALLI COUNTY FISH AND GAME ASSOCIATION,
INC., MONTANA WILDLIFE FEDERATION, INC.
SKYLINE SPORTSMEN CLUB, INC., and
ANACONDA SPORTSMEN CLUB, INC.

Plaintiffs and Appellants,

v.

MONTANA DEPARTMENT OF STATE LANDS,
MONTANA BOARD OF LAND COMMISSIONERS
and GEORGE MADDEN,

Defendants and Respondents.



FILED

SEP 29 1995

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Twenty-first Judicial District,
               In and for the County of Ravalli,
               The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

        Jack R. Tuholske, Esq., Missoula, Montana

        For Respondents:

        Patrick G. Frank, Esq., W. Carl Mendenhall, Esq.;
        Worden, Thane & Haines, Missoula, Montana

        Tommy H. Butler, Esq., Special Ass't Attorney
        General, Helena, Montana

        For Amicus Curiae:

        Thomas France, Esq., Debbie Musiker, Esq., Missoula
        Montana (for National Wildlife Federation)

        John E. Bloomquist, Esq.; Doney, Crowley & Shontz
        Helena, Montana (for Montana Stockgrowers Assoc.,
        Montana Woolgrowers Assoc. and Bitterroot
        Stockgrowers)

        Alan L, Joscelyn, Esq., Helena, Montana (for Seeley
        Lake Elem. School Dist. and Brady Combined School
        Dist.)

                    Submitted on Briefs:  May 26, 1995
                            "Decided:  September 29, 1995

Filed:

_____
                Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

The Ravalli County Fish And Game Association, Inc., Montana Wildlife Federation, Inc., Skyline Sportsmen Club, Inc., and Anaconda Sportsmen Club, Inc. (collectively, the Sportsmen) appeal from a Twenty-First Judicial District Court, Ravalli County, order granting the Montana Department Of State Lands' (DSL), Montana Board Of Land Commissioners', and George Madden's (Respondents) motion for summary judgment in a Montana Environmental Policy Act (MEPA) action. We reverse.

## FACTUAL BACKGROUND

Bighorn sheep (bighorn) are native to much of Montana but, with the settlement of the west, they were eliminated from most of their former ranges. In response to their diminished numbers, efforts have been made to reintroduce the bighorn to some of their former ranges. One such area is the Sula State Forest (Sula) and adjacent lands near the East Fork of the Bitterroot River. The presence of the bighorn adds ecological, aesthetic and economic values to the areas and communities adjacent to bighorn ranges. Along with its suitability as bighorn habitat, the Sula has a long history of livestock grazing. At issue is an alleged conflict between the grazing of domestic sheep and the health and survival of the bighorn on the adjacent range.

Until the beginning of 1991, Ralph Shoberg maintained grazing permits with the DSL on trust lands within the Sula. Shoberg grazed cattle on his permit areas. In January 1991, Shoberg transferred his permits to George R. Madden (Madden). Madden

2

subsequently changed from grazing cattle to grazing domestic sheep. A public controversy arose regarding Madden's grazing of domestic sheep upon trust lands because of the potential adverse affects on the bighorn. Evidence in the record suggests that mixing domestic sheep and bighorn can decimate the bighorn population through the spread of pneumonia and/or other diseases to the bighorn. On October 31, 1991, under the threat of a lawsuit, the DSL agreed to prepare an environmental review of the permits pursuant to MEPA. Prior to 1991, the DSL had not prepared an environmental assessment (EA) or environmental impact statement (EIS) on Madden's cattle grazing permits.

The DSL issued an EA on July 17, 1992 which included six alternatives. Appellants, private parties and state entities, submitted comments to the DSL about the EA. On September 30, 1992, the DSL issued a revised EA. On December 30, 1992, DSL commissioner Dennis Casey issued a decision notice which ended the EA process and allowed Madden's grazing leases to remain in effect until 1999, the leases' existing renewal date. With the intent to reduce the threat of transferring disease from the domestic sheep to the bighorn, the decision notice required certain measures, such as sheep dogs and grazing dates. Because Casey approved the revised EA, MEPA requirements were satisfied and no EIS was required.

On May 12, 1993, the Sportsmen filed the instant action in the District Court. On August 20, 1993, Respondents moved to dismiss the Sportsmen's claims pursuant to Rule 12(b) (6), M.R.Civ.P., for

3

failure to state a claim upon which relief could be granted. On November 23, 1993, the District Court stated that it intended to treat this motion as a Rule 56, M.R.Civ.P., motion for summary judgment. On August 10, 1994, the District Court granted Respondents' motion for summary judgment on all counts. This appeal followed.

The Sportsmen present three issues for review:

1. Did the District Court err in holding that the DSL complied with MEPA?

2. Does the DSL have a fiduciary duty towards Montana's wildlife which, under the facts of the instant case, requires the protection of the bighorn by implementing license conditions to protect the bighorn?

3. Did the District Court improperly refuse to consider affidavits, exhibits, and depositions submitted by the Sportsmen in support of their claims that the DSL unlawfully and arbitrarily violated MEPA and its trust duties toward wildlife?

STANDARD OF REVIEW

We review summary judgment orders de novo. Spain-Morrow Ranch Inc. v. West (1994), 264 Mont. 441, 444, 872 P.2d 330, 331-32.

> Summary judgment is proper only when no genuine *issue of* material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c), M.R.Civ.P. The initial burden is on the moving party to establish that there is no genuine issue of material fact; and once met, the burden shifts to the party opposing the motion to establish otherwise.

*Spain-Morrow Ranch,* 872 P.2d at 331-32 (citations omitted).

We review MEPA decisions to determine "whether the record establishes that the agency acted arbitrarily, capriciously, or unlawfully." North Fork Preservation Assoc. v. Dept. of State Lands (1989), 238 Mont. 451, 458-59, 770 P.2d 862, 867. In *North Fork* we divided our review into two parts: Whether the agency

4

acted unlawfully, and whether the agency acted arbitrarily or capriciously. *North Fork, 778* P.2d at 867.

To evaluate the lawfulness of the DSL's actions, we look to the laws and regulations governing the DSL's MEPA review process. *North Fork, 770* P.2d at 067. We therefore review §§ 75-1-101 et seq., MCA, and §§ 26.2.641 et seq., ARM. Because MEPA is modeled after the National Environmental Policy Act (NEPA), when interpreting MEPA, we find federal case law persuasive. Kadillak v. Anaconda Co. (1979), 184 Mont. 127, 137, 602 P.2d 147, 153.

### DISCUSSION

NEPA requires that an agency take a "hard look" at the environmental impacts of a given project or proposal. See Kleppe v. Sierra Club (1976), 427 U.S. 390, 410, n.21, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576, 590. NEPA is essentially procedural; it does not demand that an agency make particular substantive decisions. Stryker's Bay Neighborhood Council v. Karlen (1980), 444 U.S. 223, *227-28,* 100 S.Ct. 497, 499-500, 62 L.Ed.2d 433, 437. MEPA requires that an agency take procedural steps to review "projects, programs, legislation, and other major actions of state government significantly affecting the quality of the human environment" in order to make informed decisions. Section 75-1-201(1)(b)(iii), MCA; See § 26.2.643, ARM.

Both parties ask us to determine whether an environmental review document is necessary for the renewal or assignment of a grazing lease. Pursuant to § 77-6-205(1), MCA, a grazing lease holder:

who has paid all rentals due the state or who has voluntarily terminated a lease under 77-6-116 is entitled to have the lease renewed for a period not to exceed the maximum lease period provided in 77-6-109 at any time within 30 days prior to its expiration or within 30 days following voluntary termination if no other applications for lease of the land have been received 30 days prior to the expiration of the lease or within 30 days following voluntary termination. The renewal **must** be at the full market rental rate established by the board[, taking into account recommendations of the state land board advisory council,] for the renewal period and subject to any other conditions **at** the **time** of the renewal imposed by law as terms of the lease.

Section 77-6-208, MCA, provides for assignment of leases to state lands. The DSL rules regarding the general requirements of the environmental review process state that:

(5) The agency is not required to prepare an EA or an EIS for the following categories of action:

. . . .

(e) ministerial actions: actions in which the agency exercises no discretion, but rather acts upon a given state of facts in a prescribed manner . . . .

Section 26.2.643(5), ARM. The Sportsmen correctly argue that the renewal and assignment of a lease, permit, license, etc., pursuant to § 26.2.642(1), ARM, involves state action. Generally, state action significantly affecting the quality of the human environment requires MEPA analysis. See § 75-1-201(1)(b)(iii), MCA. However, where a license renewal or assignment merely maintains the status quo we conclude that the renewal or assignment of a grazing lease pursuant to § 77-6-205(1), MCA, is a ministerial action that requires no environmental analysis. See NRDC v. Berklund (D.C. Cir. 1979), 609 F.2d 553, 558. Absent a change in use or condition which significantly affects the quality of the human environment, the renewal or assignment of a grazing lease or permit is generally

6

a ministerial act and does not trigger MEPA analysis.

However, if a changed use or condition under a state lease or permit significantly affects the quality of the human environment, then the state's allowing that change in use or change in condition is a major state action pursuant to MEPA, triggering the MEPA review process. The United States Supreme Court has observed that "major federal actions" include the "expansion or revision of ongoing programs." Andrus v. Sierra Club (1979), 442 U.S. 347, 363 n.21, 99 S.Ct. 2335, 2344, 60 L.Ed.2d 943, 955; citing S. Rep. No. 91-296, p.20 (1969). "[I]f an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS." Upper Snake River Chapter of Trout Unlimited v. Hodel (9th Cir. 1990), 921 F.2d 232, 234.

The DSL correctly argues that if an agency does not have an affirmative statutory duty to act, the failure to act does not trigger NEPA. Defenders of Wildlife v. Andrus (D.C. Cir. 1980), 627 F.2d 1238, 1248-50. However, if an agency's duty to avoid environmental harm is mandatory, then the agency's inaction constitutes an action for NEPA purposes. See Sierra Club v. Hodel (10th Cir. 1988), 848 F.2d 1068, 1090-91. Based on the requirements of §§ 77-6-201(2), -206 and -210, MCA, the DSL has the duty to manage agricultural, grazing, and other surface leased land to protect the best interests of the state, under the multiple use concept, which necessarily includes considering consequences to wildlife and the environment. See § 77-1-203, MCA. When the DSL is made aware of changes in the existing conditions or uses

7

relating to an operation under a lease or permit, and those changes have the potential to significantly affect the quality of the human environment, then the DSL must, pursuant to MEPA, evaluate those changes for significant impacts. In the instant case substantial questions remain as to what impact grazing domestic sheep will have on the bighorn population.

> The plaintiff need not show that significant effects *will in fact* occur, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS *must* be prepared.

LaFlamme v. Federal Energy Regulatory Commission (9th Cir. 1988), *852* F.2d 389, 397.

Particularly in light of MEPA's statutory goal of promoting efforts which will prevent or eliminate damage to the environment, § *75-1-102,* MCA, and the conflicting evidence in the record, the DSL failed to sufficiently explain and substantiate its December *30,* 1992 decision to allow Madden to continue grazing sheep adjacent to the bighorn range without proceeding with an EIS. Further, it failed to sufficiently evaluate the significance of the impacts that domestic sheep would cause to the bighorn. Both the revised EA and the DSL's brief to this Court concede that the revised EA did not address the significance of impacts. An EIS must be prepared for state actions that significantly affect the quality of the human environment. Section 75-1-201(1)(b)(iii), MCA. "In order to implement [MEPA], the agency *shall determine the significance of impacts* associated with a proposed action." Section 26.2.644(1), ARM. The Sportsmen correctly point out that the DSL did not complete MEPA's mandatory "significant impacts"

analysis. Because the DSL did not in the first instance adequately determine and consider the significance of the impacts associated with grazing domestic sheep on lands adjacent to bighorn, the DSL acted arbitrarily and capriciously and unlawfully when it concluded that changes to Madden's grazing plan reduced the probable significant impact to the bighorn.

The District Court was incorrect in agreeing with the DSL that it was not required to engage in a significant impacts analysis on the theory that it was doing a voluntary as opposed to a mandatory EA. Based on our above holding, full compliance with MEPA is mandated in this case. Furthermore, we find no provisions in MEPA, the administrative rules, or case law providing for partial compliance with the law when compliance with the law is purportedly voluntary.

We do not here decide whether grazing domestic sheep adjacent to the Sula bighorn range is appropriate or not, but rather, whether the DSL's environmental review was sufficient. In the instant case, given the potential adverse impact on the bighorn, the change from grazing cattle to grazing sheep altered the existing permit to such an extent that allowing the change constituted a major state action. Thus, MEPA was triggered by DSL's awareness of the change from grazing cattle to grazing sheep adjacent to bighorn range. *See Andrus, 442* U.S. at 363 n.21. Since the DSL failed to engage in a significant impacts analysis, the matter must be remanded for preparation of an EIS. See Sierra Club v. U.S. Forest Service (9th Cir. 1988), 843 F.2d 1190. In

9

*Sierra Club,* the Forest Service decided not to prepare an EIS with regard to certain timber sales. The plaintiffs challenged that decision because the environmental assessment did not adequately discuss the relevant criteria in the federal regulations. The Ninth Circuit held that the standard for determining "if an action will significantly affect the quality of the human environment is whether the plaintiff has alleged facts which, if true, show that the . . . [action (or inaction)] may significantly degrade some human environmental factor." Sierra Club, *843* F.2d at 1193; *quoting* Foundation for North Am. Wild Sheep v. U.S. Dep't of Agriculture (9th Cir. 1982), 681 F.2d 1172, *X177-78.* "A determination that significant effects on the human environment will in fact occur is not essential. . . If substantial questions are raised whether a project may have a significant effect upon the environment, an EIS must be prepared." *Id.; quoting Foundation,* *681* F.2d at 1178. The Sierra *Club* court concluded:

> Because substantial questions have been raised concerning the potential adverse effects of harvesting these timber sales, an EIS should have been prepared. The Forest Service's decision not to do so was unreasonable. . . . It failed to account for factors necessary to determine whether significant impacts would occur. Therefore its decision was not "fully informed and well-considered." Endangered Species, 760 F.2d at 986 (quoting Vermont Yankee, *435* U.S. at 558, 98 S.Ct. at 1219). [Other citations omitted.]

*Sierra Club, 843* F.2d at 1195. Although the standard is now arbitrary and capricious rather than "reasonable," the Ninth Circuit's remedy of remanding for an EIS is still appropriate. The DSL's own records evidence the potential harm in changing from cattle to sheep in this particular area. Based on this record of

10

conflicting evidence, substantial questions remain and the DSL must comply with the requirements of MEPA and complete an EIS. It must look further at the grazing license and grazing practices to determine the significance of allowing a change from grazing cattle to grazing sheep. Implicit in the requirement that an agency take a hard look at the environmental consequences of its actions is the obligation to make an adequate compilation of relevant information, to analyze it reasonably and, perhaps most importantly, not to ignore "pertinent data." See Sierra Club v. United States Army Corps of Engineers (2nd Cir. 1982), 701 F.2d 1011, 1029. The DSL did not follow MEPA's implicit mandate that it take a hard look by completing a significant impacts analysis: The District Court therefore erred in granting summary judgment to Respondents.

It is particularly important that the DSL establish a full and complete record on review. The United States Supreme Court has addressed an agency's failure to create an adequate record:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

Florida Power and Light Co. v. Lorion (1985), 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643, 656. Along these lines, the *Hodel* court concluded that:

> [w]ithout an administrative record, courts are left to rationalize the agency's decision -- a form of review which abandons standards in favor of predilections. "This kind of speculation regarding the basis for an agency's decision not to prepare an EIS is precisely what NEPA was intended to prevent."

*11*

*Hodel*, *848* F.2d at 1093; *quoting* LaFlamme v. F.E.R.C. (9th Cir. 1988), *842* F.2d 1063, *1070.* Due to the lack of a proper significant impacts analysis, the record does not uphold the DSL's decision. The record essentially consists only of the revised EA and Decision Notice. This put the District Court in the untenable position of basing its review on a meager administrative record.

Madden suggests that if we adopt the Sportsmen's argument we will be imposing a requirement that a full EIS be completed "on every renewal and assignment of every license and lease of state land." We are not here imposing such a requirement with regard to lease renewals or assignments. Under the facts of this case, it is not the lease renewal or assignment that triggers MEPA analysis. Rather, it is the DLS's awareness of Madden's change of use from grazing cattle to grazing sheep adjacent to bighorn range in the face of evidence that such a change in use may adversely affect the bighorn. An EIS is required only when there is a substantial question as to whether the change of use may have a significant effect upon the human environment. We conclude that once the DSL became aware of this change in use, the DSL's allowing the change of use constituted a major governmental action and its duty to fully comply with MEPA was triggered. In the instant case, the DSL failed to satisfy its MEPA duties when it rendered a decision without adequately considering the significant impacts of its actions in accordance with § 75-1-201, MCA. MEPA does not require that agency actions not impact the human environment. MEPA *does* require that agencies assess their actions so as to make an

informed decision. A corollary to an informed decision is public education and input.

Even after fully complying with MEPA procedure, an agency may determine that an action will result in significant impacts and then, nonetheless, approve the action under MEPA. The agency, however, is then accountable for its decision.

> An "agency must supply a convincing statement of reasons why potential effects are insignificant." The Steamboaters v. F.E.R.C. [9th Cir. 19851, 759 F.2d [1382,] 1393. While it is true that mitigation measures can justify an agency's conclusions that a project's impact is not significant, an agency must explain exactly how the measures will **mitigate** the project's impact. *Id.* at 1394; Jones v. Gordon, 792 F.2d at 829.

*LaFlamme, 852* F.2d at 399.

In the instant case, the DSL did not engage in "significance of impacts" analysis. Accordingly it was unable to take the requisite hard look and it is impossible for this Court or the District Court to determine whether the adverse impacts have been compensated for or not.

Finally, the goal of maximizing income derived from school trust lands does not exempt the DSL or any agency from complying with applicable environmental laws. The DSL strenuously argues that its ability to modify the leases[1] at issue is limited by its state land trust duty to maximize the income derived from trust lands. In addition, the Seeley Lake and Brady School Districts and the Montana Stockgrowers, Woolgrowers, and Bitterroot Stockgrowers

---

[1] The real issue here is not whether the DSL can modify a lease but rather can the DSL, without conducting a significant impacts analysis, allow a lessee to unilaterally change the use from cattle to sheep adjacent to bighorn range.

13

Associations, filing *as amicus curiae* in support of the DSL, conclude that the state's trust obligation to secure the greatest dollar value for school trust lands is predominant. School trust lands need not be used exclusively for grazing or agriculture. See Title 77, Chapter 1, Part 4, § 77-6-209, and Title 77, Chapter 6, MCA. For instance, the Sportsmen suggest that there is precedent for the DSL and the Department of Fish, Wildlife, and Parks to agree to a plan whereby a portion of Sula bighorn hunting permit fees could go to the school trust. This would generate funds for the school trust and, assuming such hunting is ecologically sound, protect the bighorn herd. Finally, we note that neither the DSL nor the *amicus curiae* suggest why or how domestic sheep grazing generates more money for the school trust than cattle grazing. The Sportsmen and the record (sparse as it is) suggest that alternative uses to grazing may increase the value earned for the trust. Income is "a" consideration--not "the" consideration regarding school trust lands: Maximizing income is not paramount to the exclusion of wildlife or environmental considerations in the MEPA context. Sections 75-1-102, -103, and -105, MCA.

> [i]t is the continuing responsibility of the state of Montana to use all practicable means consistent with other essential considerations of state policy to improve and coordinate state plans, functions, programs, and resources to the end that the state may: (a) fulfill the responsibilities of each generation *as trustee of the environment* for succeeding generations.

Section 75-1-103(2), MCA (emphasis added). The DSL, and not this Court, is in the best position to consider alternatives as part of its MEPA analysis.

*14*

MEPA requires that an agency be informed when it balances preservation against Utilization of our natural resources and trust lands. The DSL may not, as here, reach a decision without first engaging in the requisite significant impacts analysis. The record in its present form, convinces us that the DSL by not first conducting an appropriate analysis under MEPA, arbitrarily, capriciously and unlawfully allowed Madden to change use from grazing cattle to grazing sheep adjacent to bighorn range. Therefore, we conclude that the DSL must complete an EIS to comprehensively review the environmental impacts resulting from this change of use adjacent to bighorn range.

Because of our holding in this issue, we need not consider issues two and three.

Reversed and remanded to the District Court for an order requiring preparation of an EIS.

_____
Justice

We concur.

_____
Chief Justice

_____

_____

_____
Justices

15

Justice Karla M. Gray, dissenting.


I must respectfully dissent from most of the Court's opinion and from the result it reaches. My main problems with the opinion are its overbreadth and its lack of clarity concerning which MEPA statutes or regulations the Court determines DSL actually violated here. If the Court made even a passing analysis of Montana law in resolving this case in favor of appellants, I undoubtedly would join in the opinion; I cannot do so as the opinion is written.

I agree that the standard of review of the MEPA decision at issue in this case is the "unlawful or arbitrary and capricious" standard set forth in North Fork. Unfortunately, the Court does not clearly apply that standard in resolving this case.

I also agree that, in Kadillak, we stated that it was appropriate to look to federal interpretations of NEPA in interpreting MEPA. However, nothing in Kadillak or any other source authorizes this Court to dispense altogether with applying Montana law and merely apply broad statements from selected federal cases to the factual scenario before us without any discussion of how and why those statements are applicable here. The result of this approach by the Court is a lack of analysis regarding which particular provisions of MEPA and the controlling regulations have been violated and a total lack of guidance to state agencies attempting to comply with the critically important MEPA and to state courts attempting to ensure such compliance. I cannot agree.

16

The lack of specificity in the opinion makes it difficult to craft an appropriate dissent. Thus, I offer only the following concerns and questions about the authorities on which the Court relies in resolving this case.

The Court's primary thesis about MEPA appears early in--and permeates--its opinion. According to the Court, the guiding premise of MEPA is that "[g]enerally, state action significantly affecting the quality of the human environment requires MEPA analysis." Section 75-1-201(1)(b)(iii), MCA, is cited for this proposition. The problem with the Court's approach is that "generalizing" about this pivotal statute is both misleading and erroneous.

The statute actually says that, "to the fullest extent possible[,] . . all agencies of the state . . shall include in every recommendation or report on proposals for projects, legislation, and other major actions of state government significantly affecting the quality of the human environment" a detailed statement regarding environmental impacts and effects. Section 75-1-201(1)(b)(iii), MCA. The Court does not analyze the meaning of "to the fullest extent possible." More importantly, nowhere does the Court establish that any "recommendation or report on a proposal" for a major action of state government is at issue in this case.

Most important of all, the Court never bothers to apply the definition of "action," vis-a-vis § 75-1-201(1)(b)(iii), MCA, which is found in § 26.2.642(1), ARM, to DSL's "allowing" of a change of

17

use after a grazing permit is in place and the change of use has occurred. An "action," insofar as it is relevant here, is "a project or activity involving the issuance of a lease, permit, license, certificate, or other entitlement for use or permission to act" by the agency. Section 26.2.642(1), ARM. As the Court concedes, no activity involving the issuance of a lease is at issue here. Thus, this straightforward definition simply does not support the Court's conclusion that "if a changed use or condition . . . significantly affects the quality of the human environment, then the state's allowing that change in use or change in condition is a major state action pursuant to MEPA, triggering the MEPA review process." Nor does the Court provide any other support-- under MEPA or otherwise--for this proposition.

Instead, the Court cites to one United States Supreme Court case and one Ninth Circuit Court of Appeals case which it apparently believes support its conclusion. Neither case does so even through the broad language quoted, much less through an actual application of those cases to the facts presently before us.

It is true that in Andrus v. Sierra Club (1979), 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943, the United States Supreme Court observed that major federal actions include the "expansion or revision of ongoing programs;" it did so in the context of resolving the issue of whether appropriation requests constitute "proposals for major federal actions" under NEPA. It concluded that appropriation requests were requests to fund action already proposed, rather than proposals for major government actions to be

18

taken in the future.  Sierra Club, 99 S.Ct. at 2343.  Sierra Club has no direct applicability here; it leaves unanswered, as does this Court, the specific question of what constitutes an expansion or revision of an ongoing program.  Sierra Club does point out, however, that the "proposal" language in NEPA--like that in MEPA--is intended to have some meaning, a meaning never addressed by this Court in the present case.  Indeed, this Court's purpose in quoting from Sierra Club--other than to  insert broad and inapposite language--remains  a  mystery.

Similarly, the Court's reliance on Upper Snake River Chapter of Trout Unlimited v. Hodel (9th Cir. 1990), 921 F.2d 232, is misplaced.   While that opinion does state that "if an ongoing project undergoes changes which themselves amount to 'major Federal actions,'  the operating agency must prepare an EIS," the Ninth Circuit was referring to the definition of "major Federal action" contained in NEPA.  Whatever the definition under NEPA, the case before us is governed initially by the  specific  definition  of "action" contained in § 26.2.642, ARM.  Even accepting the Ninth Circuit's broad language, however, this Court does not apply the quoted language to the facts before us.  It does not specify how, in this case, a change in an ongoing project exists, much less how such a change amounts to state action as "action" is defined in § 26.2.642(1), ARM, or to "major" state actions as the term is used in § 75-1-201(1)(b)(iii), MCA.

Moreover, I note that in Upper Snake River, the Ninth Circuit concluded,  applying the NEPA definitions,  that the Bureau of

19

Reclamation's reduction of the flow of water from the Palisades Dam on the South Fork of the Snake River in Idaho was not a major federal action. Upper Snake River, 921 F.2d at 234. It reached that conclusion in advance of any consideration of whether the action at issue had a significant effect on the environment and, indeed, declined to reach the "significant effect" issue "because the reduction does not constitute a 'major Federal action' within the meaning of the statute." Upper Snake River, 921 F.2d at 234. Thus, to the extent Upper Snake River has any application here, it clarifies that a court must first determine whether the action at issue comes within the controlling definitions of "major action;" only when that question is answered in the affirmative may the court proceed to questions involving the significance of any impacts or effects from the action at issue. In the case before us, the Court essentially turns the questions around and becomes mired in the "significance" questions prior to having applied the controlling definitions to determine whether the "action" at issue triggers MEPA analysis at all.

Finally, with regard to Upper Snake River, I reiterate that the Ninth Circuit concluded that the Bureau of Reclamation's substantial reduction in water flow from the Palisades Dam did not constitute a major federal action under NEPA. How, then, even assuming identical controlling definitions, can DSL's "nonaction" in this case constitute a major action of state government? The Court does not explain.

The Court notes its agreement with DSL's argument that, if an

20

agency does not have an affirmative duty to act, the failure to act does not trigger NEPA or, presumably, MEPA. It then quotes from Sierra Club v. Hodel (10th Cir. 1988), 848 F.2d 1068, for the proposition that "if an agency's duty to avoid environmental harm is mandatory, then the agency's inaction constitutes an action for NEPA purposes." The Court does not explain how the case relates to the situation before us and it is my view that the case is, like those referenced above, inapplicable here.

In Sierra Club, the agency's mandatory environmental duty did not spring from NEPA itself. There, the Tenth Circuit determined that the Secretary's nondegradation duty toward wilderness study areas was mandatory under the Federal Land Policy Management Act of 1976. Sierra Club, 848 F.2d at 1075. In addition, the court determined that, even if the Secretary's activity amounted to "nonaction" under the language of NEPA § 102(2)(c), requiring an EIS in advance of "major Federal actions," a Council on Environmental Quality (CEQ) regulation specifically made the Secretary's failure to act a "major federal action" for NEPA purposes. Sierra Club, 848 F.2d at 1091.

No regulation corresponding to the CEQ regulation at issue in Sierra Club--which made the "nonaction" a major federal action triggering NEPA--is involved in this case. Thus, I cannot see how Sierra Club has any application here or how it supports in any way the Court's conclusion that "[w]hen the DSL is made aware of changes in the existing conditions or uses relating to a lease or permit, and those changes have the potential to significantly

21

affect the quality of the human environment, then the DSL must, pursuant to MEPA, evaluate those changes for significant impacts."

Under the Court's decision in this case, what are state agencies or district courts to make of the clear thrust of the regulations implementing MEPA which focus on MEPA being triggered for "proposed actions"? What, for example, is the meaning of § 26.2.641, ARM, captioned Policy Statement Concerning MEPA Rules, which states that in order to fulfill the statutorily-stated purpose of MEPA, agencies must conform to the rules at §§ 26.2.642 et seq., ARM, "prior to reaching a final decision on proposed actions covered by MEPA"? Or the definition of an EA at § 26.2.642(9), ARM, as an analysis of a "proposed action to determine whether an EIS is required" or to serve one of the other purposes described in § 26.2.643(2), ARM? Or the general requirements of the environmental review process set forth in § 26.2.643, ARM, which repeatedly specify "proposed action"? Or, critically, the requirement in § 26.2.644, ARM, setting forth the criteria to be used in determining "the significance of impacts associated with a proposed action." How and when does a nonaction or a nondecision after a change of use in a state grazing permit come within the "proposed action" language which permeates the controlling regulations and the legislative policy statement in § 75-1-201(1)(b)(iii), MCA? The Court never explains, and I submit that the Court's decision today provides state agencies with no basis for evaluating when, under MEPA and the controlling regulations, MEPA will be triggered.

Finally, I feel compelled to comment on the ease with which the Court concludes not only that MEPA was triggered, but also that an EIS must be prepared. Again, the Court relies for its conclusion on broad statements from United States Courts of Appeal decisions holding that an EIS is required whenever a person alleges facts which, if true, show that the action/inaction "may" significantly degrade some human environmental factor. Again, no Montana statutes or regulations are cited or applied. Specifically, for example, the Court does not explain how the cases upon which it relies square with the clear language in § 75-I-201, MCA, that a detailed environmental statement is required for proposals for major state actions "<u>significantly affecting</u> the quality of the human environment." Nor does it address in any way the criteria set forth in § 26.2.643, ARM, for when a state agency must prepare an EIS, in particular the mandate that an EIS is required when "the proposed action is a major action of state government <u>sisnificantlv affecting</u> the quality of the human environment." Section 26.2.643(1)(b), ARM. How does the "significantly affecting" language in the Montana statute and regulation support the Court's conclusion that an EIS is required whenever an action (or, according to the Court, inaction) <u>may</u> significantly affect the environment? Are state agencies to totally disregard MEPA statutes and regulations hereafter? The Court does not explain.

I close by restating here what I stated at the outset: the troubling aspects of the Court's opinion in this case are its lack

23

of analysis of Montana statutes and regulations and the resulting lack of guidance for all concerned in these important matters involving our cherished environment. If a case _can_ be made under MEPA for the Court's decision here, the Court has not made it. For that reason, I cannot join in the Court's opinion. I dissent.

_____
Justice

Chief Justice J. A. Turnage joins in the foregoing dissent of Justice Karla M. Gray.

_____
Chief Justice