No. 98-195

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 292

STEPHANIE VAN TROBA,

Plaintiff and Respondent,

v.

MONTANA STATE UNIVERSITY and NCAA

INITIAL ELIGIBILITY CLEARINGHOUSE,

Defendants,

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant and Appellant.

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William M. Brooke and Allan H. Baris; Moore, O'Connell

& Refling, P.C.; Bozeman Montana

For Respondent:

Brian M. Morris and Richard J. Dolan; Goetz, Madden

& Dunn, P.C.; Bozeman, Montana (for Stephanie Van Troba)

Leslie C. Taylor, Attorney at Law; Bozeman, Montana

(for Montana State University)

Submitted on Briefs: July 29, 1998

Decided: December 3, 1998

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1. Stephanie Van Troba filed a complaint in the District Court for the Eighteenth Judicial District in Gallatin County against Montana State University and the National Collegiate Athletic Association after she was ruled ineligible to participate in intercollegiate athletics during her freshman year of college. After a hearing, the District Court issued a preliminary injunction which enjoined the NCAA from enforcing its rules of freshman eligibility against Van Troba and ordered that she be permitted to participate with the women's basketball team at MSU. The NCAA appeals. We hold that the appeal is moot and remand this case to the District Court.**

**¶2. The parties present two primary issues on appeal:**

**¶3. 1. Does the conclusion of the 1997-98 academic and athletic year render the NCAA's appeal moot?**

**¶4. 2. Did the District Court err when it granted the preliminary injunction?**

FACTUAL BACKGROUND

**¶5. The following facts are adopted primarily from the District Court's findings of fact.**

**¶6. Stephanie Van Troba graduated in June 1997 from Palmer High School in**

Alaska. In April 1997, she had signed a letter of intent with Montana State University, which is a member of the National Collegiate Athletic Association. Pursuant to the letter of intent and NCAA rules, Stephanie agreed to enroll at MSU and accept a full athletic scholarship from the school, in exchange for her commitment to participate intercollegiately as a member of the MSU women's basketball team.

¶7. The NCAA requires incoming student-athletes to have met certain academic standards in order to be eligible to compete in intercollegiate athletics during their freshman year. Its certification system relies on the evaluation of courses from thousands of high schools, and on the specific approval of each prospective student-athlete's high school course work and college entrance exam scores. A separate organization known as the NCAA Initial Eligibility Clearinghouse is responsible for that review.

¶8. An incoming freshman student-athlete must complete at least thirteen "core courses" as part of her high school course work to be eligible to compete as a freshman. The Clearinghouse identifies for each high school which courses qualify as core courses by means of a list known as Form 48-H. The Clearinghouse may issue updated versions of Form 48-H based upon an annual review of a school's courses and/or to reflect changes regarding which courses qualify as core courses; the different versions are distinguished by different letters of the alphabet. For example, Form 48-H (Version B) follows and takes the place of Form 48-H (Version A). The Clearinghouse communicates with one specific person at each high school, who is then responsible, in conjunction with prospective student-athletes, for making sure that individual student-athletes meet the requirement of thirteen core courses. If a student-athlete is declared ineligible to compete in her freshman year, she may, among other options, pursue an education at the university at her own expense for the first year, and retain three years of athletic eligibility, as opposed to the potential five years of athletic eligibility that she otherwise would have been entitled to if she had not been ruled ineligible.

¶9. In Stephanie's case, Patricia Chesbro, the principal at Palmer High School, served as the Clearinghouse contact person. In the fall of 1996, Chesbro advised Stephanie and other prospective NCAA student-athletes about Clearinghouse requirements and about which of the Palmer High School courses qualified as core courses. She relied on Form 48-H (Version C), which was dated May 7, 1996, and

had been provided to her by the Clearinghouse in the spring of 1996; the form represented the most up-to-date statement that Palmer High School had from the Clearinghouse about which courses qualified as core courses. Form 48-H (Version C) listed Journalism I, among many others, as an acceptable core course. In reliance on Form 48-H (Version C) and to fulfill in part her obligation to complete thirteen core courses, Stephanie enrolled in Journalism I for the 1996 fall semester.

¶10. The NCAA contends that three subsequent versions of Form 48-H were mailed to Palmer High School, each of which excluded Journalism I from the list of approved courses. Clearinghouse records suggest that Version D was mailed at the end of July, Version E was mailed in August, and Version F was mailed in November 1996; the Clearinghouse has no actual record of the forms themselves. Records at Palmer High School indicate that none of the three forms was ever received by the school. The District Court ultimately found that the Clearinghouse failed to mail any of the three Form 48-Hs.

¶11. Chesbro did receive a new Form 48-H (Version G) in January 1997. Form 48-H (Version G) did not list Journalism I as an approved core course. By that time, Stephanie and other students had completed the course.

¶12. In July 1996, Chesbro had provided the Clearinghouse with additional information about the journalism course, as well as another course, after it had requested the information pursuant to a separate eligibility matter with another recently-graduated Palmer High School student-athlete. When she received Form 48-H (Version G) in January, Chesbro contacted the Clearinghouse about what she assumed was a mistake regarding the omission of Journalism I from the list of approved courses.

¶13. The Clearinghouse normally contacted high schools in February of each year and asked them to revise and update their Form 48-H and to resubmit it to the Clearinghouse. The purpose of the annual review was so that an updated Form 48-H could reflect changes made by either the school in its curriculum or the Clearinghouse in its evaluation of the courses, with the ultimate goal being to accurately advise prospective student-athletes for the following academic year. Pursuant to the Clearinghouse's instruction, in March 1997, Chesbro resubmitted to the Clearinghouse Form 48-H (Version G) with Journalism I on the list with the expectation that the next Form 48-H would indicate that Journalism I was in fact an

approved core course.

¶14. When she spoke with the Clearinghouse, Chesbro expressed her concern about the potential effect that a rejection of Journalism I might have on those prospective student-athletes who had relied on Form 48-H (Version C) and taken the course to satisfy their thirteen course obligation. She also wrote to an official at the NCAA regarding her concern over the Clearinghouse's apparently retroactive decision to disapprove the course after prospective student-athletes had relied on its statement that the course was approved. During the same period, she received Form 48-H (Version H) from the Clearinghouse. It also rejected Journalism I as an approved core course.

¶15. In March 1997, Chesbro received a written response from the NCAA, in which it assured her that an initial eligibility waiver process existed for those students who may have been hurt by the Clearinghouse's decision. In addition, the letter addressed her concerns regarding retroactivity. It stated that there was a proposal to be acted upon in April 1997 by the relevant governing committee at the NCAA which would permit student-athletes "to receive credit for courses that were approved on the high school Form 48-H confirmation at the time the student completed the course." Based in part on these assurances, Chesbro decided not to investigate the status of prospective student-athletes whose eligibility with the Clearinghouse might have been affected as a result of the decision to no longer certify Journalism I. Similarly, she decided not to inform Stephanie or any of the other prospective student-athletes about the Clearinghouse's disapproval of Journalism I.

¶16. The NCAA finally rejected Journalism I as a core course in June 1997, as specially notated on Clearinghouse Form 48-H (Version J), which was sent to Chesbro in July 1997.

¶17. MSU had begun recruiting Stephanie to play basketball in December 1996. At the time, it received from Palmer High School a copy of both Stephanie's transcript and what the high school believed to be its most up-to-date Form 48-H--Form 48-H (Version C). When MSU signed Stephanie to a letter of intent in April 1997, it had neither sought nor received any further verification from the Clearinghouse or Palmer High School regarding Stephanie's ability to satisfy Clearinghouse standards. She eventually graduated with an overall grade point average of 3.41, including a 2.88 GPA in her core courses; her college entrance exam scores were 75 total on the

ACT and 960 on the SAT. Stephanie exceeded Clearinghouse standards in each of these areas. However, due to the rejection of Journalism I as an approved core course, Stephanie fell short of the thirteen course requirement by one-half core credit.

¶18. During the summer, the Clearinghouse notified MSU that Stephanie had not satisfied its initial eligibility requirements due to her reliance on Journalism I as one of her core courses. Stephanie learned then for the first time that her eligibility was in doubt. MSU contacted Chesbro, who in turn wrote to one of the women's basketball coaches at MSU and explained the full circumstances of Stephanie's enrollment in the course, including their reliance on Form 48-H (Version C), and the school's subsequent and unexpected notice that the course had been rejected by the Clearinghouse. Stephanie enrolled at MSU that fall. She still had not been certified by the Clearinghouse and, as a result, MSU was unable to apply her scholarship aid.

¶19. Calli Sanders is an assistant athletic director at MSU. She serves as the University's compliance coordinator and, as such, is responsible for NCAA rules education, compliance, and enforcement, including Clearinghouse eligibility, at MSU. In August 1997, she was still relatively new on the MSU staff, and learned from both the Clearinghouse and the basketball coach with whom Chesbro had communicated that Stephanie had not been certified. She also communicated with Chesbro and received the same explanation regarding Stephanie's situation. She decided to pursue an initial eligibility waiver with the NCAA on behalf of Stephanie.

¶20. The NCAA waiver process first involves review by NCAA staff. If the waiver is denied, a university can appeal the decision to an NCAA subcommittee. If the appeal is also denied, the university can then seek review before the NCAA's full initial eligibility committee. The criteria at each stage require the university to show extraordinary circumstances to justify consideration of a waiver and additional evidence that the student-athlete is proficient in the area of core credit deficiency. In addition, if a student-athlete has been recruited by the university, the NCAA applies a stricter standard of review. The reviewing body relies in part on its past eligibility decisions regarding other student-athletes in similar situations.

¶21. On September 16, 1997, Sanders submitted an initial eligibility waiver to the NCAA on Stephanie's behalf. The proposed waiver relied on the fact that, according to Chesbro's knowledge, Journalism I was removed from the 48-H list of approved

courses only after Stephanie had completed the course. On October 27, 1997, the NCAA denied the waiver. Its decision stated that Palmer High School had "received notification that Journalism I was not an approved core course on July 26, 1996 (Version D), and August 27, 1996 (Version E)."

¶22. Sanders contacted Palmer High School, the Clearinghouse, and the NCAA in an attempt to receive copies of the Form 48-H (Versions D, E, and F) that allegedly notified the high school about the disqualification of Journalism I. None of them could provide her with a copy of any of the three forms.

¶23. Sanders learned at approximately the same time that the University of Indiana had submitted a waiver of initial eligibility to the NCAA on behalf of another Palmer High School student-athlete who faced the same problem as Stephanie due to his reliance on Journalism I as a core course. The facts surrounding Stephanie's waiver are nearly identical to those of the Indiana student-athlete's waiver: both student-athletes relied on Journalism I as a core course and only learned after their completion of the course that the Clearinghouse no longer recognized it; they took the class together and both received the same grade in the course; they scored approximately the same on their college entrance exams; and they were recruited at approximately the same time. The only potentially meaningful difference in their waivers was that Stephanie's classmate's core course GPA was 3.52, as compared to Stephanie's 2.88. On August 5, 1997, the NCAA granted the waiver of the Indiana student-athlete. Based largely on the similarity of the two student-athletes' situations and the NCAA's grant of a waiver to the first student, Sanders appealed the NCAA's waiver decision on November 19, 1997.

¶24. Chuck Lindemenn is the MSU Athletic Director. He is also Chairman of the NCAA subcommittee that regulates the Clearinghouse. He initially limited his involvement in Stephanie's appeal to avoid the appearance of improper influence. However, as he became more aware of the facts surrounding Stephanie's situation, he became convinced that Palmer High School had advised Stephanie to the best of its knowledge, and that Stephanie should not be ineligible. Accordingly, he instructed Sanders to inform the NCAA that MSU's appeal dated November 19 would be superseded by his upcoming appeal on Stephanie's behalf.

¶25. Like Sanders, Lindemenn contacted the Clearinghouse to obtain copies of the forms that allegedly were sent to Palmer High School notifying it that Journalism I

no longer qualified as a core course. Just as before, however, the Clearinghouse could not document Versions D, E, and F, to Lindemenn or establish that it had in fact sent the forms to Chesbro. The Clearinghouse acknowledged that in spite of the three subsequent versions of Form 48-H that were supposed to have been sent to Palmer High School, all correspondence with the Clearinghouse initiated by Chesbro used Form 48-H (Version C).

¶26. The appeal was eventually filed on November 24, 1997. It alleged the lack of any tangible proof that the Clearinghouse had notified Chesbro regarding the changes to Form 48-H, referred to the Indiana student-athlete's waiver, and discussed in detail how the only notice from the Clearinghouse in Chesbro's possession at the time that she advised Stephanie regarding Journalism I indicated that the course was an approved core course. The NCAA denied the appeal on December 3, 1997, based on what it described as Stephanie's "marginal overall academic record."

¶27. Throughout the waiver process, Stephanie attended classes at MSU at her own expense. However, she remained ineligible to practice or play with the women's basketball team. Stephanie testified that after the first waiver was denied, she had plans to leave MSU and return to Alaska because it was too difficult for her to be on campus and see her teammates but not be able to participate in basketball with them.

¶28. On December 9, 1997, after the NCAA rejected MSU's appeal on Stephanie's behalf, Stephanie filed a complaint in the District Court against MSU and the NCAA. She presented the facts and relied in part on the NCAA's waiver in the case of the Indiana student-athlete. Stephanie sought relief from the District Court in the form of a declaration that she had in fact completed the thirteen core course requirement and, therefore, that she was eligible to compete during her freshman year. In addition, she sought relief to enjoin the defendants from denying her the scholarship that MSU had promised and from prohibiting her participation with the basketball team.

¶29. The District Court held a hearing on December 17-18, 1997. On December 29, 1997, it made findings of fact on which the previous discussion is based, and concluded that Stephanie was entitled to a preliminary injunction based upon her letter of intent and on her showing of a *prima facie* case. Additionally, it concluded that: (1) she would suffer irreparable injury without the injunction due to her continued inability to compete with the basketball team; (2) the continued exclusion

of Stephanie from the basketball team throughout the remainder of the season would render any final action by the District Court ineffectual; and (3) the balance of hardships tipped in Stephanie's favor. Accordingly, it issued a preliminary injunction that barred the NCAA and MSU from preventing Stephanie from playing basketball and from receiving her scholarship pending a final ruling on her complaint.

¶30. At the time of the hearing, MSU still had an opportunity to appeal the NCAA's December 3, 1997, decision. The District Court noted that even though Stephanie could pursue a second appeal with the NCAA, all the relevant information had been presented to the NCAA, and the District Court implied that there was little reason to expect a different decision. More importantly, it noted that Stephanie would remain ineligible throughout the second appeal, which had the potential to extend well into January 1998.

¶31. On January 14, 1998, Stephanie amended her complaint to add the Clearinghouse as a defendant. She also made additional claims based on equitable estoppel, promissory estoppel, negligent misrepresentation, and negligent infliction of emotional distress.

¶32. MSU chose not to appeal the District Court's order, while the Clearinghouse was not bound by the order and, therefore, is not a party to this appeal.

## DISCUSSION

¶33. Does the conclusion of the 1997-98 academic and athletic year render the NCAA's appeal moot?

¶34. Stephanie contends that the NCAA's appeal regarding the District Court's alleged error from its issuance of the preliminary injunction is now moot. We address this issue first because its determination is potentially dispositive of the appeal.

¶35. This Court normally does not address moot questions. *See Smith v. Electronic Parts, Inc.* (1995), 274 Mont. 252, 258, 907 P.2d 958, 962; *In re T.J.F.* (1987), 229 Mont. 473, 475, 747 P.2d 1356, 1357; *State ex rel. Miller v. Murray* (1979), 183 Mont. 499, 503, 600 P.2d 1174, 1176. "A moot question is one which existed once but because of an event or happening, it has ceased to exist and no longer presents an

actual controversy." *Miller*, 183 Mont. at 503, 600 P.2d at 1176. For purposes of an appeal, a question becomes moot "where by a change of circumstances prior to the appellate decision the case has lost any practical purpose for the parties, for instance where the grievance that gave rise to the case has been eliminated." *In re T.J.F.*, 229 Mont. at 475, 747 P.2d at 1357 (quoting 5 Am. Jur. 2d *Appeal and Error* § 762 (1962)).

¶36. Stephanie contends that the District Court's preliminary injunction addressed only her freshman eligibility. She asserts that since she has completed her freshman year, her freshman eligibility is no longer at issue and subject to interference from the NCAA. Therefore, she claims that the propriety of the District Court's decision to grant the preliminary injunction is no longer relevant to the remaining claim which addresses generally how many years of eligibility Stephanie is entitled to and whether or not she was entitled to scholarship money during her freshman year.

¶37. The NCAA disagrees that its challenge to the preliminary injunction is moot. It contends that it is still subject to the District Court's injunction and that it has no remedy other than this appeal of the District Court's actions. In addition, it states that all of the substantive issues raised here regarding the District Court's grant of the preliminary injunction remain material to the underlying case.

¶38. Stephanie's mootness claim is based on the fact that criteria for a student-athlete's eligibility vary from year to year. For example, freshman eligibility is determined entirely by the Clearinghouse, based upon a student-athlete's high school academic record. A student-athlete's eligibility in subsequent years, however, is purely a function of her collegiate academic performance; the determination depends in no part whatsoever on initial eligibility status.

¶39. In other words, Stephanie's eligibility is no longer affected by what she claims is the Clearinghouse's mistake regarding her initial eligibility, as was the case when the District Court granted the preliminary injunction. For that reason, she contends that regardless of whether the District Court's injunction was correct, it no longer represents an actual controversy between the parties.

¶40. The NCAA does not contest the fact that so long as Stephanie's academic performance at MSU meets NCAA standards, she has the privilege[1] to participate in intercollegiate athletics and receive her scholarship for at least her second and third years of college. The NCAA might prevail in the underlying claim and thus be

permitted to limit Stephanie's eligibility and financial aid to three years instead of five. As a practical matter, however, it cannot take away Stephanie's athletic participation as an eligible freshman, even if that "eligibility" was the result of an error by the District Court. After the fact, it can do nothing more than require Stephanie to pay back the scholarship that she received her freshman year and count her freshman participation against her as one of the three years for which she would otherwise have been eligible. Therefore, the District Court's injunction, which was issued for the sole purpose of preventing the loss of Stephanie's freshman year of eligibility, is of no practical consequence to the parties now that Stephanie has completed her freshman year at MSU and exhausted her freshman year of eligibility. Accordingly, we hold that the issue is moot and will not address whether the District Court erred when it granted the injunction.

¶41. The NCAA contends that our decision in *J.M. v. Montana High School Ass'n* (1994), 265 Mont. 230, 875 P.2d 1026, compels that we review the District Court's decision. *J.M.* involved a high school student-athlete who was deemed ineligible pursuant to a restriction on the number of years (four) that a student-athlete can participate in high school athletics. The student-athlete sought a waiver of the rule from the Montana High School Association, then also filed a complaint in the district court to prevent the Association from enforcing the rule against him. The district court granted a preliminary injunction and thereby permitted the student-athlete to play his fifth season of high school football. The MHSA appealed the injunction, and this Court ultimately reversed the district court's order for reasons that do not apply here.

¶42. The Court's decision in *J.M.*, like the situation here, came after the student-athlete had been allowed to participate in the disputed season of eligibility. There, however, the Court rejected the idea that the appeal was moot, despite the fact that the injunction had lapsed and the student-athlete's season, and thus his high school eligibility, had expired. The Court stated:

To mechanically apply the doctrine of mootness under such circumstances would effectively deny the remedy of appeal. Where MHSA will, undoubtedly, be faced with future challenges to its maximum participation rules on issues and facts such as those presented here, it has a right to a final decision of this Court on the merits of its appeal.

*J.M.*, 265 Mont. at 241-42, 875 P.2d at 1033. In J.M., a decision from this Court that the issue was moot would have essentially denied the MHSA all opportunity to have the validity of its regulations affirmed. Moreover, it

would have permitted J.M., as well as all other student-athletes who were likely to subsequently come before the MHSA with similar claims, to prevail while they evaded review altogether.

**¶43. That risk is not present here. As we stated above, the Clearinghouse decision, in conjunction with the NCAA's denial of an initial eligibility waiver, has a dual effect. First, it has the immediate impact of barring a student-athlete from intercollegiate participation in her freshman year and from receipt of her athletic scholarship during the period of her ineligibility. Second, it consequently reduces the number of years in which a student-athlete is potentially eligible from five to three.**

**¶44. Therefore, the underlying claim regarding whether Stephanie should in fact have been ineligible during her freshman year remains, and the resolution of that issue will have very real consequences. Unlike the situation presented in *J.M.*, we have no reason to suspect that this claim will not proceed in the District Court or to believe that the NCAA will be denied the opportunity to receive a final judgment, and our ultimate consideration of the matter, if desired, on the merits. Stephanie's amended complaint, which was filed after the injunction issued, attests that there is more at stake in this case than just Stephanie's freshman basketball season. Simply put, this case will not evade review as the result of our holding that the preliminary injunction is now a moot issue. Accordingly, *J.M.* does not apply.**

**¶45. For these reasons, we hold that the appeal is moot and remand this case to the District Court for further consideration of the merits of Stephanie Van Troba's complaint.**

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

No

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

1. [1]A student-athlete's eligibility depends on many factors and is never in fact an absolute right. *See T.H. v. Montana High School Ass'n* (D. Mont., Sept. 24, 1992), CV-92-150-BLG-JFB at 10 ("Generally speaking, a student has no constitutional right to participate in interscholastic sports; it is a privilege which may be withdrawn by the school or by a voluntary association whose rules the school has agreed to follow."); *see also M. H. v. Montana High School Ass'n* (1996), 280 Mont. 123, 131, 929 P.2d 239, 244*; J.M. v. Montana High School Ass'n* (1994), 265 Mont. 230, 237, 875 P.2d 1026, 1031. Nonetheless, barring some extraordinary occurrence, Stephanie's letter of intent and her continued academic progress entitle her to play basketball and receive a scholarship to attend classes at MSU.