DA 22-0112

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2023 MT 86

WATER FOR FLATHEAD'S FUTURE, INC., AMY WALLER,
STEVEN MOORE, and CYNTHIA EDSTROM,

      Plaintiffs and Appellees,

  v.

MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY,

      Defendant and Appellant,

  and

MONTANA ARTESIAN WATER COMPANY,

      Intervenor-Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                      In and For the County of Flathead, Cause No. DV-2017-1109(A)
                      Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Kirsten H. Bowers, Montana Department of Environmental Quality,
            Helena, Montana

            Victoria A. Marquis, Crowley Fleck PLLP, Billings, Montana (for Montana
            Artesian Water Company)

      For Appellees:

            Roger M. Sullivan, McGarvey Law, Kalispell, Montana

            Robert M. Gentry, Gentry Law, PLLC, Missoula, Montana

            David K. W. Wilson, Jr., Morrison, Sherwood, Wilson & Deola, PLLP,
            Helena, Montana

Submitted on Briefs:  October 26, 2022

Decided:  May 16, 2023

Filed:

_____
Clerk

2

Justice Jim Rice delivered the Opinion of the Court.

¶1 Defendants Montana Department of Environmental Quality (DEQ) and Montana Artesian Water Company (Artesian) appeal from the order of the Eleventh Judicial District Court, Flathead County, granting summary judgment to Appellees Water for Flathead's Future (WFF) and vacating the Montana Pollutant Discharge Elimination System (MPDES) permit issued by DEQ to Artesian. We address the following issues:

1. *Has this matter been mooted?*

2. *Did the District Court err by concluding that DEQ, in issuing a MPDES permit to Artesian, failed to take the requisite "hard look" at concerns raised by the EPA and USFWS?*

3. *Did the District Court err by holding DEQ improperly considered only the volume of water that would be discharged under Artesian's MPDES permit, rather than the full volume of water authorized for use under the DNRC's water use permit?*

¶2 We conclude the matter has not been mooted, and reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 Artesian is a for-profit corporation endeavoring to operate a water bottling facility on land it owns in the Creston area of Flathead County. To supply water for the facility, Artesian applied in June 2015 for, and was eventually issued, a Beneficial Water Use Permit from the Department of Natural Resources and Conservation (DNRC).[1] Artesian's water right authorizes it to use up to 450 gallons per minute (gpm), sufficient to fill about

---

[1] Artesian's Beneficial Use Permit is not before the Court in this appeal, but is the subject of the appeal in *Flathead Lakers v. DNRC*, DA 21-0535, the Opinion in which is being issued contemporaneously with this Opinion.

3

140,000 bottles of water per hour or 1.2 billion bottles per year. As part of the application process for the water use permit, in compliance with the Montana Environmental Policy Act (MEPA), DNRC conducted an Environmental Assessment (EA) of the impacts arising from Artesian's full use of its requested water right. The EA concluded that Artesian's use of the groundwater would not "have any negative impacts on the water quality of the Flathead River or Flathead Lake." The EA further concluded that Artesian's water use would have no significant impact on threatened or endangered species in the area, including bull trout.

¶4 Prior to filling each bottle with water from the onsite well, Artesian washes each plastic bottle. The rinse water is then discharged into a nearby unnamed tributary (UT) to the Flathead River. The rinse water is not exposed to any contamination in the process; the only anticipated pollutant is suspended solids from dust and other debris that may be contained in the bottles. Additionally, Artesian uses non-contact geothermically heated water to heat the facility. This water is not exposed to contaminants, and is therefore discharged untreated at a rate not to exceed 60 gpm at a temperature of 43 to 45 degrees Fahrenheit.

¶5 In October 2015, pursuant to the Montana Water Quality Act, Artesian applied with DEQ for a discharge permit authorizing its wastewater discharge. Because Artesian was in a start-up phase, it requested a permit for discharge of only 1.8 gpm, a small fraction of Artesian's projected full-capacity discharge during bottling operations with maximal usage

4

of its water right.[2] Such discharge permits extend for five years, meaning that, upon its expiration, Artesian would be required to re-apply for whatever quantity of water expected to be discharged during the following five-year period. Additionally, the flow rate of the Permit cannot be increased while in effect without a major modification, which would require an application, a new MPDES permit, an EA, and a public comment period.

¶6      DEQ reviewed Artesian's permit application, prepared an EA, a draft Permit, and a fact sheet. In its EA, DEQ referenced DNRC's earlier EA to note the expected impacts of Artesian's maximal usage of the 450-gpm water right, but provided an original analysis that was confined to the impacts of Artesian's 1.8-gpm discharge. In June 2016, DEQ issued public notice of its initial determination to issue Artesian's requested permit, and invited public comment. During the public comment period, DEQ received comments from the public, Artesian, the Environmental Protection Agency (EPA) and the United States Fish and Wildlife Service (USFWS) regarding the draft Permit.

¶7      EPA expressed concerns about the limited quantity of data used to reach conclusions for the Permit,[3] the means of measuring potential pollutants in the effluent, the impact of the increased seasonal waterflow into the UT, and the permit's lack of required monitoring and reporting. In response to these comments, DEQ collected an additional well sample,

_____

[2] Artesian's 1.8 gpm MPDES discharge permit will hereinafter be referred to as "the Permit."

[3] Specifically, because the two water samples testing the quality of the source well were taken in February and March, the EPA expressed concerns about the need for additional testing to account for potential seasonal variation.

imposed additional monitoring and reporting requirements regarding suspended solids in the effluent, and provided an explanation that stream flow levels were expected to be relatively constant outside of snow melt influxes and that any change is unlikely to be impactful because of the character of the UT.[4]

¶8 USFWS's comments discussed some of the same issues addressed by the EPA, and added concerns about potential impacts to downstream aquatic species such as bull trout and the absence of preventative measures to avoid accidental spills of hazardous materials. DEQ responded by adding a permitting requirement that Artesian implement and maintain "best management practices" to minimize the risk of accidental releases of pollutants. DEQ also explained that other beneficial uses of state waters, such as propagation of fish, would be fully preserved under the Permit's existing mandatory effluent limits and monitoring requirements. According to DEQ, the nature of the recipient UT, in conjunction with the Permit's effluent limits, meant that no significant adverse impacts to bull trout would occur. Neither federal agency submitted any further comments following DEQ's responses.

¶9 On November 1, 2017, the Permit took effect, after which WFF initiated this proceeding in the District Court, claiming DEQ's issuance of the Permit violated MEPA. The lengthy proceedings included the joining of Artesian as a party, a brief stay following a separate district court decision regarding Artesian's water right, cross-motions for

---

[4] Artesian's discharge was expected to cause only an eight percent increase to the UT's mean monthly flow.

6

summary judgment, and over a year of briefing. During the entire period, Artesian operated pursuant to the Permit, as no injunction had been sought.

¶10 In July 2021, the District Court entered an order granting, in part, WFF's motion for summary judgment, based upon its determination DEQ had erred in two respects. First, the District Court held that DEQ's responses to the comments from EPA and USFWS were inadequate, based on the unsubstantiated nature of DEQ's responses regarding potential impacts to bull trout. Second, the District Court concluded DEQ's analysis of the Permit's environmental impact was inadequate because DEQ failed to consider the cumulative impact of Artesian's discharge level upon completion of its full-scale facility. The District Court vacated the Permit. DEQ and Artesian appeal.

## STANDARD OF REVIEW

¶11 This Court reviews summary judgment rulings de novo for correctness. *Bitterrooters for Planning, Inc. v. Mont. Dep't of Envtl. Quality*, 2017 MT 222, ¶ 15, 388 Mont. 453, 401 P.3d 712. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3). During reviews of administrative rulings, "[t]he Court's focus is on the administrative decision-making process rather than the decision itself." *Park Cty. Envtl. Council v. Mont. Dep't of Envtl. Quality*, 2020 MT 303, ¶ 18, 402 Mont. 168, 477 P.3d 288. Agency decisions involving "substantial agency expertise" are generally given "great deference." *Park Cty.*, ¶ 18.

7

¶12    When reviewing an agency's environmental review under MEPA, courts determine whether the agency's decision was unlawful or arbitrary and capricious. *Bitterrooters*, ¶ 15. "An agency decision is unlawful if it does not comply with governing laws and administrative rules." *Bitterrooters*, ¶ 15. "An agency decision is arbitrary and capricious if made without consideration of all relevant factors or based on a clearly erroneous judgment." *Bitterrooters*, ¶ 16. "A review under the arbitrary and capricious standard 'does not permit a reversal merely because the record contains inconsistent evidence or evidence which might support a different result. Rather, the decision being challenged must appear to be random, unreasonable or seemingly unmotivated based on the existing record.'" *Mont. Wildlife Fed'n v. Mont. Bd. of Oil & Gas Conservation*, 2012 MT 128, ¶ 25, 365 Mont. 232, 280 P.3d 877 (quoting *Hobble Diamond Ranch, LLC v. State*, 2012 MT 10, ¶ 24, 363 MT 310, 268 P.3d 31). "The [party] challenging the [agency's] decision has the burden of proving the claim by clear and convincing evidence contained in the record." Section 75-1-201(6)(a)(i), MCA.

**DISCUSSION**

¶13    *1. Has this matter been mooted?*

¶14    This Court's jurisdiction is limited to justiciable controversies. *Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 567. Because justiciability relates to subject matter jurisdiction, issues of justiciability can be raised at any time. *Stanley v. Lemire*, 2006 MT 304, ¶ 31, 334 Mont. 489, 148 P.3d 643. Within justiciability, the mootness doctrine requires that "the requisite personal interest that must

exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Plan Helena*, ¶ 10. Should the initial controversy cease to exist "due to an intervening event or change in circumstances" during the course of litigation such that this Court is unable "to grant effective relief or to restore the parties to their original position," then this Court is obligated to dismiss the case as moot. *Plan Helena*, ¶¶ 10-11. Such is the case when "the grievance that gave rise to the case has been eliminated." *Skinner Enters. v. Lewis & Clark City-County Health Dep't*, 1999 MT 106, ¶ 13, 294 Mont. 310, 980 P.2d 1049 (quoting *Van Troba v. Montana State Univ.*, 1998 MT 292, ¶ 35, 291 Mont. 522, 970 P.2d 1029).

¶15 WFF briefly argues that this matter has been mooted because the five-year term of the Permit has by now expired, and Artesian did not initiate an application to renew the Permit at least 180 days prior to expiration as required by Admin. R. M. 17.30.1322(4). WFF also acknowledges that, because Artesian will again apply for a Permit, that the "capable of repetition" exception to mootness may apply, and thus "the Court may wish to exercise its discretion" to answer the issues raised on appeal. DEQ responds that, because the Permit was vacated by the District Court prior to its expiration, DEQ could not have entertained and processed a renewal application from Artesian to extend a permit that had been voided and, consequently, Artesian was not required to submit a meaningless renewal application. Instead, if this litigation determines the vacatur was improper, Artesian will then be required to submit a renewal application.

¶16    The controversy before the Court is DEQ's approval of the Permit. The District Court determined that DEQ erred by issuing the Permit, and vacated it. Appeal of that determination and the vacatur have prompted procedural delay, during which time there was no permit to be renewed. If the vacatur is upheld, then Artesian would be required to restart the application process from step one. If overturned, then DEQ's original issuance would stand and Artesian could apply for renewal. These potential outcomes demonstrate the determination of whether DEQ properly approved Artesian's initial application remains a live controversy suitable for adjudication by this Court.

¶17    *2. Did the District Court err by concluding that DEQ, in issuing a MPDES permit to Artesian, failed to take the requisite "hard look" at concerns raised by the EPA and USFWS?*

¶18    The District Court accepted WFF's argument that DEQ did not adequately respond to the comments provided by EPA and USFWS, and therefore failed to take the "hard look" required by MEPA.[5] WFF faults DEQ's response to EPA's concerns about limited data availability regarding water quality and quantity, and USFWS's concerns regarding bull trout. DEQ argues the District Court erred by failing to give DEQ the deference owed to the agency, and that, under such deference, DEQ adequately addressed the concerns of each agency by demonstrating sufficient data and revising the proposed Permit to require additional testing and preventative measures.

---

[5] The District Court concluded that the measures taken by DEQ in response to the federal agencies' comments was not reasonable.

¶19 MEPA, like its federal counterpart, the National Environmental Policy Act (NEPA), is "essentially procedural." *Mont. Wildlife*, ¶ 32. It does not "demand that an agency make particular substantive decisions," but rather "requires an agency to review projects, programs, legislation, and other major actions of state government significantly affecting the quality of the human environment in order to make informed decisions." *Mont. Wildlife*, ¶ 32 (quoting *Ravalli County Fish & Game Ass'n v. Montana Dep't of State Lands*, 273 Mont. 371, 377-78, 903 P.2d 1362, 1367 (1995)). Under MEPA, agencies are required to take a "hard look" at the record regarding potential environmental impacts. *Belk v. Mont. Dep't of Envtl. Quality*, 2022 MT 38, ¶ 17, 408 Mont. 1, 504 P.3d 1090; *Clark Fork Coalition v. Mont. Dep't of Envtl. Quality*, 2008 MT 407, ¶ 47, 347 Mont. 197, 197 P.3d 482.

¶20 A "hard look" requires an agency to conduct an initial evaluation of the proposed action, that is, an environmental assessment (EA), to determine the significance of potential environmental impacts. Admin. R. M. 36.2.524. If the EA determines the proposed action would not have a significant adverse environmental impact, the agency may proceed with the action. However, if the proposed action is expected to have a significant adverse impact, then the agency must prepare an Environmental Impact Statement (EIS). Admin. R. M. 36.2.524. "An EA thus serves as both the initial tool for determining whether a more intensive EIS is necessary and as the mechanism for required environmental review of agency actions that will likely impact the environment but not sufficiently to require an EIS." *Bitterrooters*, ¶ 20. The agency's EA must account for

individual and cumulative impacts of the action with reference to a multitude of factors. *See* Admin. R. M. 36.2.524.

¶21 When reviewing an agency's decision-making process, "this Court 'looks closely' . . . to determine whether the agency has taken a 'hard look' by fulfilling its obligation to 'make an adequate compilation of *relevant* information, to analyze it reasonably, and to consider all *pertinent* data.'" *Park Cty.*, ¶ 18 (quoting *Clark Fork Coal.*, ¶ 47) (emphasis added). Because assessment of environmental impact fits squarely within an agency's "significant technical and scientific expertise beyond the grasp of the Court," courts "afford[] 'great deference' to agency decisions"—here, DEQ's evaluation of the significance of potential adverse environmental impacts from issuance of the Permit. *Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality*, 2019 MT 213, ¶ 20, 397 Mont. 161, 451 P.3d 493. It remains the duty of the courts "to interpret the law." *Mont. Envtl. Info. Ctr.*, ¶ 20.

¶22 Following issuance of the EA, DEQ received public comment from EPA and USFWS. In response to these comments, DEQ provided additional data and analysis, implemented additional effluent limitation and safety measure requirements for the Permit, and allowed time for additional agency feedback, but received none. Consequently, based upon its review, including the additional conditions for the Permit, DEQ concluded the Permit would have no significant environmental impacts and that preparation of an EIS was unnecessary. It therefore proceeded to issue the proposed Permit.

¶23 A primary concern of the District Court, and one WFF emphasizes in its appellate brief, is DEQ's failure to conclusively determine whether the unnamed tributary (UT) receiving discharge is suitable for bull trout. The District Court faulted DEQ's characterization of the UT as unsuitable for bull trout based on the court's perception that DEQ had relied solely on Artesian's representations in making this determination.[6] Additionally, DEQ personnel spotted small fish in the UT, but did not identify the species. These perceived shortcomings led the District Court to conclude DEQ failed to take the requisite "hard look."

¶24 However, the District Court's consideration of whether a hard look had been given to the relevant information related to this concern did not contemplate the entirety of DEQ's rationale. *Park Cty.*, ¶ 18. While DEQ did not identify the species of small fish spotted in the UT and, consequently, did not know whether the bull trout existed in the UT, DEQ points out that, whether bull trout are present in the UT itself, or merely in the nearby Flathead River, is no longer an active concern because it imposed sufficient effluent limitations, monitoring requirements, and safety protocols upon the Permit to protect bull trout anywhere nearby. WFF does not contest that the Permit's effluent limits and conditions are sufficient to protect the quality of water necessary for bull trout. Given these precautions, the specific identification of the small fish species did not continue to be a

---

[6] Indeed, DEQ described the UT as "not suitable bull trout habitat due to its low flow, narrow straight channel, silty substrate, and short distance," which language is similar to that used by Artesian to describe the UT. DEQ does not explain specifically where this language originated.

relevant consideration because the effluent limitations ensure that bull trout, and their habitat, will be protected regardless of their proximity to the facility.

¶25 These circumstances distinguish *Ravalli County Fish & Game Ass'n v. Montana Dep't of State Lands*, 273 Mont. 371, 903 P.2d 1362 (1995), a case on which WFF heavily relies. In *Ravalli*, the Montana Department of State Lands (DSL) conducted an EA for a requested grazing permit in which DSL neglected to determine or consider the significance of the potential impacts of grazing domesticated sheep in historical bighorn sheep territory, despite known dangers of interspecies disease transmission. *Ravalli*, 273 Mont. at 376, 380, 903 P.2d at 1365-66, 1368. Consequently, this Court concluded "DSL acted arbitrarily and capriciously and unlawfully when it concluded that changes to [the] grazing plan reduced the probable significant impact to the bighorn" and remanded the case to DSL to conduct an EIS, instructing the agency to "take a hard look at the environmental consequences of its actions [and] to make an adequate compilation of relevant information, to analyze it reasonably and, perhaps most importantly, not to ignore pertinent data." *Ravalli*, 273 Mont. at 380-81, 903 P.2d at 1368-69 (internal quotation omitted). Unlike the DSL in *Ravalli*, DEQ has considered the potential impacts of the Permit on bull trout and other environmental factors, and has concluded the enhanced effluent limitations and safety measures will prevent any significant adverse impacts.

¶26 DEQ specifically addressed the other concerns expressed by the EPA and USFWS by providing relevant data and adjusting the conditions of the Permit. In response to the agencies' concerns about water quality, DEQ provided an additional well sample and noted

that the permit limited the maximum total suspended solids—the only pollutant expected to be present in the effluent. Regarding concerns about the UT's flowrate, DEQ explained that Artesian's facility was expected to increase the UT's flow rate by only approximately eight percent—below the fifteen percent threshold that constitutes a significant change. DEQ's increase of monitoring requirements and safety measures to avoid significant impacts to bull trout or other aquatic species in the UT or Flathead River, explained above, likewise enhanced water quality consideration.

¶27    DEQ's actions here stand in stark contrast to *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2009), which held that the Bureau of Land Management acted arbitrarily following its preparation of an EIS for grazing program changes. The agency received comments from the EPA, USFWS, and state agencies directly contradicting its conclusion of no significant impact, and then "neither responded to their considered comments objectively and in good faith nor made responsive changes to the proposed regulations," and instead relied solely on the assertion that the changes would "'improve the efficiency and effectiveness' of grazing administration." *Kraayenbrink*, 632 F.3d at 492-93. Rather, this case aligns with the facts of *Park Cty.*, wherein DEQ's analysis of potential water impacts resulting from proposed mining exploration was deemed insufficient by the district court due to DEQ's prioritization of certain well samples over others. *Park Cty.*, ¶ 15. On appeal, this Court upheld DEQ's analysis that found no significant impact, because "[t]he process of assigning relative

15

weights to conflicting data for predictive purposes is essentially a technical exercise requiring agency expertise that should be afforded substantial deference." *Park Cty.*, ¶ 43.

¶28 Here, assessment of the impact of effluent outflow into the UT from Artesian's facility falls squarely within DEQ's area of expertise, and its conclusion that the effluent limitations, monitoring requirements, and safety protocols are sufficient to negate any significant impacts warrants substantial deference. While DEQ's responses could have been more complete,[7] these potential deficiencies do not overcome the deference owed to DEQ. As such, as we did in *Park Cty.*, we conclude DEQ did not act arbitrarily, capriciously, or unlawfully, and that the District Court therefore improperly substituted its own judgment for the agency's.

¶29 *3. Did the District Court err by holding DEQ improperly considered only the volume of water that would be discharged under Artesian's MPDES permit, rather than the full volume of water authorized for use under the DNRC's water use permit?*

¶30 WFF argues, and the District Court agreed, that DEQ erred by considering only the impacts of the quantity of water to be discharged during Artesian's start-up phase (initial discharge), and not the quantity of discharge that would be authorized under DNRC's water use permit for Artesian's fully operational facility (full discharge). DEQ responds that its analysis was appropriate given that Artesian applied for authorization of only the initial

---

[7] DEQ did not provide a well sample from a substantially different time of year despite the EPA's concerns about potential seasonal variance in the well's water quality—it instead supplemented its February and March water samples with a third from April.

16

discharge amount, and that any future increase of authority to discharge water under Artesian's permit would require a separate environmental review.

¶31 An agency must consider the individual, cumulative, and secondary environmental impacts of a proposed action. Admin. R. M. 17.4.609(3)(d). "Cumulative impact" is defined as:

> the collective impacts on the human environment of the proposed action when considered in conjunction with other past and present actions related to the proposed action by location or generic type. Related future actions must also be considered when these actions are under concurrent consideration by any state agency through preimpact statement studies, separate impact statement evaluation, or permit processing procedures.

Admin. R. M. 17.4.603(7). "Secondary impact" is an impact that "may be stimulated or induced by or otherwise result from a direct impact of the action." Admin. R. M. 17.4.603(18).

¶32 Evaluation of all related environmental impacts of a proposed action is triggered when the action has reached the "go/no go" juncture—the point at which there has been an "irretrievable commitment of resources" or "successive steps set into irreversible motion." *Park Cty.*, ¶ 32. In determining whether a proposed action is a cause of an environmental impact, we have rejected a "but for" causation test, and instead held that MEPA requires "a reasonably close causal relationship between the triggering state action and the subject environmental effect." *Bitterrooters*, ¶ 33 ("requiring a state agency to consider environmental impacts it has no authority to lawfully prevent would not serve MEPA's purposes of ensuring that agencies and the interested public have sufficient information regarding relevant environmental impacts to inform the lawful exercise of agency

17

authority"). At this juncture, only the discharge associated with Artesian's start-up phase is at issue before the agency.

¶33 The District Court concluded Artesian's fully operational facility had already reached the "go/no go" juncture, meaning that, as a past and presently related action to the Permit, the impact of DNRC's water use permit must also be assessed in this review. However, this reasoning is contrary to the designed purpose of the proposed permit—to authorize Artesian to discharge only the 1.8 gpm of water associated with its start-up phase.[8] Artesian would be required to apply for a different MPDES permit for the full discharge of its operational facility, requiring the agency to conduct a separate environmental review. DEQ had no authority at this juncture to assess or "lawfully prevent" environmental impacts associated with the discharge of Artesian's fully operational facility. DNRC may have granted Artesian the right to beneficially use 450 gpm, but the proposed MPDES permit only allows Artesian to discharge 1.8 gpm.

¶34 This issue again mirrors *Park Cty.*, in which this Court considered whether DEQ had erred in its assessment of the environmental impacts of a mining exploration permit by not considering the impacts of the planned full-scale mining facility. *Park Cty.*, ¶ 30. We determined that, because the mining company would be required to obtain separate DEQ approval for future mining operations, DEQ's grant of the exploration license did not "irreversibly set in motion a chain of events inevitably leading to a full-scale mine." *Park*

---

[8] 1.8 gpm is roughly 0.4 percent of the fully operational facility's projected full discharge of 450 gpm.

18

*Cty.*, ¶ 33. We therefore concluded that the "go/no go" juncture had not been reached, and that DEQ's EA for the exploration permit did not need to consider the environmental impacts of the full-scale mine. *Park Cty.*, ¶¶ 33-34. The same is true of DEQ's decision to grant Artesian the Permit.

¶35 Lastly, we conclude the District Court erred by vacating the Permit. Section 75-1-201(6)(c), MCA, declares the "exclusive" remedies for successful challenges to an agency's environmental review. Section 75-1-201(6)(c), MCA, provides that a court

> may not enjoin the issuance or effectiveness of a license or permit or a part of a license or permit issued pursuant to Title 75 or Title 82 unless the court specifically finds that the party requesting the relief is more likely than not to prevail on the merits of its complaint given the uncontroverted facts in the record and applicable law and, in the absence of a temporary restraining order, a preliminary injunction, a permanent injunction, or other equitable relief, that the:
> (A) party requesting the relief will suffer irreparable harm in the absence of the relief;
> (B) issuance of the relief is in the public interest. In determining whether the grant of the relief is in the public interest, a court:
> (I) may not consider the legal nature or character of any party; and
> (II) shall consider the implications of the relief on the local and state economy and make written findings with respect to both.
> (C) relief is as narrowly tailored as the facts allow to address both the alleged noncompliance and the irreparable harm the party asking for the relief will suffer. In tailoring the relief, the court shall ensure, to the extent possible, that the project or as much of the project as possible can go forward while also providing the relief to which the applicant has been determined to be entitled.

The District Court acknowledged that vacatur was improper under these provisions, but nevertheless vacated the Permit based on "inherent authority" it drew from our decision in *Park Cty.*

19

¶36 The current language of § 75-1-201(6)(c), MCA, was not effective at the time of our holding in *Park Cty*. Rather, the Court's invalidation of § 75-1-201(6)(c), MCA (2011), as unconstitutional in *Park Cty.* triggered the statute's contingency remedy language, set forth above, which then went into effect. 2011 Montana Laws Ch. 396, S.B. 233 § 11. Thus, the currently effective version of § 75-1-201(6)(c)(i), MCA, provides that "[t]he remedies provided in this section for successful challenges to a decision of the agency or the adequacy of the statement are exclusive." This provision is not constitutionally challenged here. The District Court thus erred by departing from its framework and vacating the Permit.

¶37 Reversed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR